Justice GORSUCH delivered the opinion of the Court.
*1737 Sometimes small gestures can have unexpected consequences. Major initiatives practically guarantee them. In our time, few pieces of federal legislation rank in significance with the Civil Rights Act of 1964. There, in Title VII, Congress outlawed discrimination in the workplace on the basis of race, color, religion, sex, or national origin. Today, we must decide whether an employer can fire someone simply for being homosexual or transgender. The answer is clear. An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids.
Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result. Likely, they weren't thinking about many of the Act's consequences that have become apparent over the years, including its prohibition against discrimination on the basis of motherhood or its ban on the sexual harassment of male employees. But the limits of the drafters' imagination supply no reason to ignore the law's demands. When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit.
I
Few facts are needed to appreciate the legal question we face. Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender-and allegedly for no reason other than the employee's homosexuality or transgender status.
Gerald Bostock worked for Clayton County, Georgia, as a child welfare advocate. Under his leadership, the county won national awards for its work. After a decade with the county, Mr. Bostock began participating in a gay recreational softball league. Not long after that, influential *1738 members of the community allegedly made disparaging comments about Mr. Bostock's sexual orientation and participation in the league. Soon, he was fired for conduct "unbecoming" a county employee.
Donald Zarda worked as a skydiving instructor at Altitude Express in New York. After several seasons with the company, Mr. Zarda mentioned that he was gay and, days later, was fired.
Aimee Stephens worked at R.G. & G.R. Harris Funeral Homes in Garden City, Michigan. When she got the job, Ms. Stephens presented as a male. But two years into her service with the company, she began treatment for despair and loneliness. Ultimately, clinicians diagnosed her with gender dysphoria and recommended that she begin living as a woman. In her sixth year with the company, Ms. Stephens wrote a letter to her employer explaining that she planned to " live and work full-time as a woman" after she returned from an upcoming vacation. The funeral home fired her before she left, telling her "this is not going to work out."
While these cases began the same way, they ended differently. Each employee brought suit under Title VII alleging unlawful discrimination on the basis of sex. 78 Stat. 255, 42 U.S.C. § 2000e-2(a)(1). In Mr. Bostock's case, the Eleventh Circuit held that the law does not prohibit employers from firing employees for being gay and so his suit could be dismissed as a matter of law. 723 Fed.Appx. 964 (2018). Meanwhile, in Mr. Zarda's case, the Second Circuit concluded that sexual orientation discrimination does violate Title VII and allowed his case to proceed. 883 F.3d 100 (2018). Ms. Stephens's case has a more complex procedural history, but in the end the Sixth Circuit reached a decision along the same lines as the Second Circuit's, holding that Title VII bars employers from firing employees because of their transgender status. 884 F.3d 560 (2018). During the course of the proceedings in these long-running disputes, both Mr. Zarda and Ms. Stephens have passed away. But their estates continue to press their causes for the benefit of their heirs. And we granted certiorari in these matters to resolve at last the disagreement among the courts of appeals over the scope of Title VII's protections for homosexual and transgender persons. 587 U.S. ----, 139 S.Ct. 1599, 203 L.Ed.2d 754 (2019).
II
This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations. See New Prime Inc. v. Oliveira , 586 U.S. ----, ---- - ----, 139 S.Ct. 532, 538-539, 202 L.Ed.2d 536 (2019).
With this in mind, our task is clear. We must determine the ordinary public meaning of Title VII's command that it is "unlawful ... for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." § 2000e-2(a)(1). To do so, we orient ourselves to the time of the statute's adoption, here 1964, and begin by examining *1739 the key statutory terms in turn before assessing their impact on the cases at hand and then confirming our work against this Court's precedents.
A
The only statutorily protected characteristic at issue in today's cases is "sex"-and that is also the primary term in Title VII whose meaning the parties dispute. Appealing to roughly contemporaneous dictionaries, the employers say that, as used here, the term "sex" in 1964 referred to "status as either male or female [as] determined by reproductive biology." The employees counter by submitting that, even in 1964, the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation. But because nothing in our approach to these cases turns on the outcome of the parties' debate, and because the employees concede the point for argument's sake, we proceed on the assumption that "sex" signified what the employers suggest, referring only to biological distinctions between male and female.
Still, that's just a starting point. The question isn't just what "sex" meant, but what Title VII says about it. Most notably, the statute prohibits employers from taking certain actions "because of " sex. And, as this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' " University of Tex. Southwestern Medical Center v. Nassar , 570 U.S. 338, 350, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013) (citing Gross v. FBL Financial Services, Inc. , 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) ; quotation altered). In the language of law, this means that Title VII's "because of " test incorporates the " 'simple' " and "traditional" standard of but-for causation. Nassar , 570 U.S. at 346, 360, 133 S.Ct. 2517. That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. See Gross , 557 U.S. at 176, 129 S.Ct. 2343. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.
This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. Cf. Burrage v. United States , 571 U.S. 204, 211-212, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014). When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff 's sex was one but-for cause of that decision, that is enough to trigger the law. See ibid . ; Nassar , 570 U.S. at 350, 133 S.Ct. 2517.
No doubt, Congress could have taken a more parsimonious approach. As it has in other statutes, it could have added "solely" to indicate that actions taken "because of " the confluence of multiple factors do not violate the law. Cf. 11 U.S.C. § 525 ; 16 U.S.C. § 511. Or it could have written "primarily because of " to indicate that the prohibited factor had to be the main cause of the defendant's challenged employment decision. Cf. 22 U.S.C. § 2688. But none of this is the law we have. If anything, Congress has moved in the opposite direction, supplementing Title VII in 1991 to allow a plaintiff to prevail merely by showing that a protected trait like sex was a "motivating factor" in a defendant's challenged employment practice. Civil Rights Act of 1991, § 107, 105 Stat. 1075, codified at *1740 42 U.S.C. § 2000e-2(m). Under this more forgiving standard, liability can sometimes follow even if sex wasn't a but-for cause of the employer's challenged decision. Still, because nothing in our analysis depends on the motivating factor test, we focus on the more traditional but-for causation standard that continues to afford a viable, if no longer exclusive, path to relief under Title VII. § 2000e-2(a)(1).
As sweeping as even the but-for causation standard can be, Title VII does not concern itself with everything that happens "because of " sex. The statute imposes liability on employers only when they "fail or refuse to hire," "discharge," "or otherwise ... discriminate against" someone because of a statutorily protected characteristic like sex. Ibid. The employers acknowledge that they discharged the plaintiffs in today's cases, but assert that the statute's list of verbs is qualified by the last item on it: "otherwise ... discriminate against." By virtue of the word otherwise , the employers suggest, Title VII concerns itself not with every discharge, only with those discharges that involve discrimination.
Accepting this point, too, for argument's sake, the question becomes: What did "discriminate" mean in 1964? As it turns out, it meant then roughly what it means today: "To make a difference in treatment or favor (of one as compared with others)." Webster's New International Dictionary 745 (2d ed. 1954). To "discriminate against" a person, then, would seem to mean treating that individual worse than others who are similarly situated. See Burlington N. & S. F. R. Co. v. White , 548 U.S. 53, 59, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). In so-called "disparate treatment" cases like today's, this Court has also held that the difference in treatment based on sex must be intentional. See, e.g., Watson v. Fort Worth Bank & Trust , 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). So, taken together, an employer who intentionally treats a person worse because of sex-such as by firing the person for actions or attributes it would tolerate in an individual of another sex-discriminates against that person in violation of Title VII.
At first glance, another interpretation might seem possible. Discrimination sometimes involves "the act, practice, or an instance of discriminating categorically rather than individually." Webster's New Collegiate Dictionary 326 (1975); see also post, at 1768- 1769, n. 22 (ALITO, J., dissenting). On that understanding, the statute would require us to consider the employer's treatment of groups rather than individuals, to see how a policy affects one sex as a whole versus the other as a whole. That idea holds some intuitive appeal too. Maybe the law concerns itself simply with ensuring that employers don't treat women generally less favorably than they do men. So how can we tell which sense, individual or group, "discriminate" carries in Title VII?
The statute answers that question directly. It tells us three times-including immediately after the words "discriminate against"-that our focus should be on individuals, not groups: Employers may not "fail or refuse to hire or ... discharge any individual , or otherwise ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." § 2000e-2(a)(1) (emphasis added). And the meaning of "individual" was as uncontroversial in 1964 as it is today: "A particular being as distinguished from a class, species, or collection." Webster's New International Dictionary, at 1267. Here, again, Congress could have written the law differently. It might have said that "it shall be an unlawful employment *1741 practice to prefer one sex to the other in hiring, firing, or the terms or conditions of employment." It might have said that there should be no "sex discrimination," perhaps implying a focus on differential treatment between the two sexes as groups. More narrowly still, it could have forbidden only "sexist policies" against women as a class. But, once again, that is not the law we have.
The consequences of the law's focus on individuals rather than groups are anything but academic. Suppose an employer fires a woman for refusing his sexual advances. It's no defense for the employer to note that, while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall. The employer is liable for treating this woman worse in part because of her sex. Nor is it a defense for an employer to say it discriminates against both men and women because of sex. This statute works to protect individuals of both sexes from discrimination, and does so equally. So an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally. But in both cases the employer fires an individual in part because of sex. Instead of avoiding Title VII exposure, this employer doubles it.
B
From the ordinary public meaning of the statute's language at the time of the law's adoption, a straightforward rule emerges: An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It doesn't matter if other factors besides the plaintiff 's sex contributed to the decision. And it doesn't matter if the employer treated women as a group the same when compared to men as a group. If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee-put differently, if changing the employee's sex would have yielded a different choice by the employer-a statutory violation has occurred. Title VII's message is "simple but momentous": An individual employee's sex is "not relevant to the selection, evaluation, or compensation of employees." Price Waterhouse v. Hopkins , 490 U.S. 228, 239, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion).
The statute's message for our cases is equally simple and momentous: An individual's homosexuality or transgender status is not relevant to employment decisions. That's because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex. Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable *1742 and impermissible role in the discharge decision.
That distinguishes these cases from countless others where Title VII has nothing to say. Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent. But unlike any of these other traits or actions, homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.
Nor does it matter that, when an employer treats one employee worse because of that individual's sex, other factors may contribute to the decision. Consider an employer with a policy of firing any woman he discovers to be a Yankees fan. Carrying out that rule because an employee is a woman and a fan of the Yankees is a firing "because of sex" if the employer would have tolerated the same allegiance in a male employee. Likewise here. When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play-both the individual's sex and something else (the sex to which the individual is attracted or with which the individual identifies). But Title VII doesn't care. If an employer would not have discharged an employee but for that individual's sex, the statute's causation standard is met, and liability may attach.
Reframing the additional causes in today's cases as additional intentions can do no more to insulate the employers from liability. Intentionally burning down a neighbor's house is arson, even if the perpetrator's ultimate intention (or motivation) is only to improve the view. No less, intentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal of discriminating against homosexual or transgender employees. There is simply no escaping the role intent plays here: Just as sex is necessarily a but-for cause when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably intends to rely on sex in its decisionmaking. Imagine an employer who has a policy of firing any employee known to be homosexual. The employer hosts an office holiday party and invites employees to bring their spouses. A model employee arrives and introduces a manager to Susan, the employee's wife. Will that employee be fired? If the policy works as the employer intends, the answer depends entirely on whether the model employee is a man or a woman. To be sure, that employer's ultimate goal might be to discriminate on the basis of sexual orientation. But to achieve that purpose the employer must, along the way, intentionally treat an employee worse based in part on that individual's sex.
An employer musters no better a defense by responding that it is equally happy to fire male and female employees who are homosexual or transgender. Title VII liability is not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women. Instead, the law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII. So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title *1743 VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.
At bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings. For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms-and that "should be the end of the analysis." 883 F.3d at 135 (Cabranes, J., concurring in judgment).
C
If more support for our conclusion were required, there's no need to look far. All that the statute's plain terms suggest, this Court's cases have already confirmed. Consider three of our leading precedents.
In Phillips v. Martin Marietta Corp. , 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam ), a company allegedly refused to hire women with young children, but did hire men with children the same age. Because its discrimination depended not only on the employee's sex as a female but also on the presence of another criterion-namely, being a parent of young children-the company contended it hadn't engaged in discrimination "because of " sex. The company maintained, too, that it hadn't violated the law because, as a whole, it tended to favor hiring women over men. Unsurprisingly by now, these submissions did not sway the Court. That an employer discriminates intentionally against an individual only in part because of sex supplies no defense to Title VII. Nor does the fact an employer may happen to favor women as a class.
In Los Angeles Dept. of Water and Power v. Manhart , 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), an employer required women to make larger pension fund contributions than men. The employer sought to justify its disparate treatment on the ground that women tend to live longer than men, and thus are likely to receive more from the pension fund over time. By everyone's admission, the employer was not guilty of animosity against women or a "purely habitual assumptio[n] about a woman's inability to perform certain kinds of work"; instead, it relied on what appeared to be a statistically accurate statement about life expectancy. Id. , at 707-708, 98 S.Ct. 1370. Even so, the Court recognized, a rule that appears evenhanded at the group level can prove discriminatory at the level of individuals. True, women as a class may live longer than men as a class. But "[t]he statute's focus on the individual is unambiguous," and any individual woman might make the larger pension contributions and still die as early as a man. Id. , at 708, 98 S.Ct. 1370. Likewise, the Court dismissed as irrelevant the employer's insistence that its actions were motivated by a wish to achieve classwide equality between the sexes: An employer's intentional discrimination on the basis of sex is no more permissible when it is prompted by some further intention (or motivation), even one as prosaic as seeking to account for actuarial tables. Ibid. The employer violated Title VII because, when its policy worked exactly as planned, it could not "pass the simple test" asking whether an individual female employee would have been treated the same regardless of her sex. Id. , at 711, 98 S.Ct. 1370.
In Oncale v. Sundowner Offshore Services, Inc. , 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), a male plaintiff alleged that he was singled out by his male co-workers for sexual harassment. The Court held it was immaterial that members of the same sex as the victim committed the alleged discrimination. Nor did the Court *1744 concern itself with whether men as a group were subject to discrimination or whether something in addition to sex contributed to the discrimination, like the plaintiff 's conduct or personal attributes. "[A]ssuredly," the case didn't involve "the principal evil Congress was concerned with when it enacted Title VII." Id. , at 79, 118 S.Ct. 998. But, the Court unanimously explained, it is "the provisions of our laws rather than the principal concerns of our legislators by which we are governed." Ibid. Because the plaintiff alleged that the harassment would not have taken place but for his sex-that is, the plaintiff would not have suffered similar treatment if he were female-a triable Title VII claim existed.
The lessons these cases hold for ours are by now familiar.
First, it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it. In Manhart , the employer called its rule requiring women to pay more into the pension fund a "life expectancy" adjustment necessary to achieve sex equality. In Phillips , the employer could have accurately spoken of its policy as one based on "motherhood." In much the same way, today's employers might describe their actions as motivated by their employees' homosexuality or transgender status. But just as labels and additional intentions or motivations didn't make a difference in Manhart or Phillips , they cannot make a difference here. When an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex. And that is all Title VII has ever demanded to establish liability.
Second, the plaintiff 's sex need not be the sole or primary cause of the employer's adverse action. In Phillips , Manhart , and Oncale , the defendant easily could have pointed to some other, nonprotected trait and insisted it was the more important factor in the adverse employment outcome. So, too, it has no significance here if another factor-such as the sex the plaintiff is attracted to or presents as-might also be at work, or even play a more important role in the employer's decision.
Finally, an employer cannot escape liability by demonstrating that it treats males and females comparably as groups. As Manhart teaches, an employer is liable for intentionally requiring an individual female employee to pay more into a pension plan than a male counterpart even if the scheme promotes equality at the group level. Likewise, an employer who intentionally fires an individual homosexual or transgender employee in part because of that individual's sex violates the law even if the employer is willing to subject all male and female homosexual or transgender employees to the same rule.
III
What do the employers have to say in reply? For present purposes, they do not dispute that they fired the plaintiffs for being homosexual or transgender. Sorting out the true reasons for an adverse employment decision is often a hard business, but none of that is at issue here. Rather, the employers submit that even intentional discrimination against employees based on their homosexuality or transgender status supplies no basis for liability under Title VII.
The employers' argument proceeds in two stages. Seeking footing in the statutory text, they begin by advancing a number of reasons why discrimination on the basis of homosexuality or transgender status doesn't involve discrimination because of sex. But each of these arguments turns out only to repackage errors we've already *1745 seen and this Court's precedents have already rejected. In the end, the employers are left to retreat beyond the statute's text, where they fault us for ignoring the legislature's purposes in enacting Title VII or certain expectations about its operation. They warn, too, about consequences that might follow a ruling for the employees. But none of these contentions about what the employers think the law was meant to do, or should do, allow us to ignore the law as it is.
A
Maybe most intuitively, the employers assert that discrimination on the basis of homosexuality and transgender status aren't referred to as sex discrimination in ordinary conversation. If asked by a friend (rather than a judge) why they were fired, even today's plaintiffs would likely respond that it was because they were gay or transgender, not because of sex. According to the employers, that conversational answer, not the statute's strict terms, should guide our thinking and suffice to defeat any suggestion that the employees now before us were fired because of sex. Cf. post, at 1755 - 1756 (ALITO, J., dissenting); post, at 1826 - 1829 (KAVANAUGH, J., dissenting).
But this submission rests on a mistaken understanding of what kind of cause the law is looking for in a Title VII case. In conversation, a speaker is likely to focus on what seems most relevant or informative to the listener. So an employee who has just been fired is likely to identify the primary or most direct cause rather than list literally every but-for cause. To do otherwise would be tiring at best. But these conversational conventions do not control Title VII's legal analysis, which asks simply whether sex was a but-for cause. In Phillips , for example, a woman who was not hired under the employer's policy might have told her friends that her application was rejected because she was a mother, or because she had young children. Given that many women could be hired under the policy, it's unlikely she would say she was not hired because she was a woman. But the Court did not hesitate to recognize that the employer in Phillips discriminated against the plaintiff because of her sex. Sex wasn't the only factor, or maybe even the main factor, but it was one but-for cause-and that was enough. You can call the statute's but-for causation test what you will-expansive, legalistic, the dissents even dismiss it as wooden or literal. But it is the law.
Trying another angle, the defendants before us suggest that an employer who discriminates based on homosexuality or transgender status doesn't intentionally discriminate based on sex, as a disparate treatment claim requires. See post , at 1758 - 1760 (ALITO, J., dissenting); post , at 1828 - 1829 (KAVANAUGH, J., dissenting). But, as we've seen, an employer who discriminates against homosexual or transgender employees necessarily and intentionally applies sex-based rules. An employer that announces it will not employ anyone who is homosexual, for example, intends to penalize male employees for being attracted to men and female employees for being attracted to women.
What, then, do the employers mean when they insist intentional discrimination based on homosexuality or transgender status isn't intentional discrimination based on sex? Maybe the employers mean they don't intend to harm one sex or the other as a class. But as should be clear by now, the statute focuses on discrimination against individuals, not groups. Alternatively, the employers may mean that they don't perceive themselves as motivated by a desire to discriminate based on sex. But nothing in Title VII turns on the employer's *1746 labels or any further intentions (or motivations) for its conduct beyond sex discrimination. In Manhart , the employer intentionally required women to make higher pension contributions only to fulfill the further purpose of making things more equitable between men and women as groups. In Phillips , the employer may have perceived itself as discriminating based on motherhood, not sex, given that its hiring policies as a whole favored women. But in both cases, the Court set all this aside as irrelevant. The employers' policies involved intentional discrimination because of sex, and Title VII liability necessarily followed.
Aren't these cases different, the employers ask, given that an employer could refuse to hire a gay or transgender individual without ever learning the applicant's sex? Suppose an employer asked homosexual or transgender applicants to tick a box on its application form. The employer then had someone else redact any information that could be used to discern sex. The resulting applications would disclose which individuals are homosexual or transgender without revealing whether they also happen to be men or women. Doesn't that possibility indicate that the employer's discrimination against homosexual or transgender persons cannot be sex discrimination?
No, it doesn't. Even in this example, the individual applicant's sex still weighs as a factor in the employer's decision. Change the hypothetical ever so slightly and its flaws become apparent. Suppose an employer's application form offered a single box to check if the applicant is either black or Catholic. If the employer refuses to hire anyone who checks that box, would we conclude the employer has complied with Title VII, so long as it studiously avoids learning any particular applicant's race or religion? Of course not: By intentionally setting out a rule that makes hiring turn on race or religion, the employer violates the law, whatever he might know or not know about individual applicants.
The same holds here. There is no way for an applicant to decide whether to check the homosexual or transgender box without considering sex. To see why, imagine an applicant doesn't know what the words homosexual or transgender mean. Then try writing out instructions for who should check the box without using the words man, woman, or sex (or some synonym). It can't be done. Likewise, there is no way an employer can discriminate against those who check the homosexual or transgender box without discriminating in part because of an applicant's sex. By discriminating against homosexuals, the employer intentionally penalizes men for being attracted to men and women for being attracted to women. By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today. Any way you slice it, the employer intentionally refuses to hire applicants in part because of the affected individuals' sex, even if it never learns any applicant's sex.
Next, the employers turn to Title VII's list of protected characteristics-race, color, religion, sex, and national origin. Because homosexuality and transgender status can't be found on that list and because they are conceptually distinct from sex, the employers reason, they are implicitly excluded from Title VII's reach. Put another way, if Congress had wanted to address these matters in Title VII, it would have referenced them specifically. Cf. post, at 1757 - 1758 (ALITO, J., dissenting); post, at 1828 - 1830 (KAVANAUGH, J., dissenting).
But that much does not follow. We agree that homosexuality and transgender status are distinct concepts from *1747 sex. But, as we've seen, discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second. Nor is there any such thing as a "canon of donut holes," in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule. And that is exactly how this Court has always approached Title VII. "Sexual harassment" is conceptually distinct from sex discrimination, but it can fall within Title VII's sweep. Oncale , 523 U.S. at 79-80, 118 S.Ct. 998. Same with "motherhood discrimination." See Phillips , 400 U.S. at 544, 91 S.Ct. 496. Would the employers have us reverse those cases on the theory that Congress could have spoken to those problems more specifically? Of course not. As enacted, Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them.
The employers try the same point another way. Since 1964, they observe, Congress has considered several proposals to add sexual orientation to Title VII's list of protected characteristics, but no such amendment has become law. Meanwhile, Congress has enacted other statutes addressing other topics that do discuss sexual orientation. This postenactment legislative history, they urge, should tell us something. Cf. post , at 1754 - 1755, 1776 - 1778 (ALITO, J., dissenting); post , at 1823 - 1824, 1830 - 1831 (KAVANAUGH, J., dissenting).
But what? There's no authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't amend this one. Maybe some in the later legislatures understood the impact Title VII's broad language already promised for cases like ours and didn't think a revision needed. Maybe others knew about its impact but hoped no one else would notice. Maybe still others, occupied by other concerns, didn't consider the issue at all. All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a "particularly dangerous" basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt. Pension Benefit Guaranty Corporation v. LTV Corp. , 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) ; see also United States v. Wells , 519 U.S. 482, 496, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) ; Sullivan v. Finkelstein , 496 U.S. 617, 632, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history ... should not be taken seriously, not even in a footnote").
That leaves the employers to seek a different sort of exception. Maybe the traditional and simple but-for causation test should apply in all other Title VII cases, but it just doesn't work when it comes to cases involving homosexual and transgender employees. The test is too blunt to capture the nuances here. The employers illustrate their concern with an example. When we apply the simple test to Mr. Bostock-asking whether Mr. Bostock, a man attracted to other men, would have been fired had he been a woman-we don't just change his sex. Along the way, we change his sexual orientation too (from homosexual to heterosexual). If the aim is to isolate whether a plaintiff 's sex caused the dismissal, the employers stress, we must hold sexual orientation constant-meaning we need to change both his sex and the sex to which he is attracted. So for Mr. Bostock, the question should be whether he would've been fired if he were *1748 a woman attracted to women. And because his employer would have been as quick to fire a lesbian as it was a gay man, the employers conclude, no Title VII violation has occurred.
While the explanation is new, the mistakes are the same. The employers might be onto something if Title VII only ensured equal treatment between groups of men and women or if the statute applied only when sex is the sole or primary reason for an employer's challenged adverse employment action. But both of these premises are mistaken. Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups; an employer who fires both lesbians and gay men equally doesn't diminish but doubles its liability. Just cast a glance back to Manhart , where it was no defense that the employer sought to equalize pension contributions based on life expectancy. Nor does the statute care if other factors besides sex contribute to an employer's discharge decision. Mr. Bostock's employer might have decided to fire him only because of the confluence of two factors, his sex and the sex to which he is attracted. But exactly the same might have been said in Phillips , where motherhood was the added variable.
Still, the employers insist, something seems different here. Unlike certain other employment policies this Court has addressed that harmed only women or only men, the employers' policies in the cases before us have the same adverse consequences for men and women. How could sex be necessary to the result if a member of the opposite sex might face the same outcome from the same policy?
What the employers see as unique isn't even unusual. Often in life and law two but-for factors combine to yield a result that could have also occurred in some other way. Imagine that it's a nice day outside and your house is too warm, so you decide to open the window. Both the cool temperature outside and the heat inside are but-for causes of your choice to open the window. That doesn't change just because you also would have opened the window had it been warm outside and cold inside. In either case, no one would deny that the window is open "because of" the outside temperature. Our cases are much the same. So, for example, when it comes to homosexual employees, male sex and attraction to men are but-for factors that can combine to get them fired. The fact that female sex and attraction to women can also get an employee fired does no more than show the same outcome can be achieved through the combination of different factors. In either case, though, sex plays an essential but-for role.
At bottom, the employers' argument unavoidably comes down to a suggestion that sex must be the sole or primary cause of an adverse employment action for Title VII liability to follow. And, as we've seen, that suggestion is at odds with everything we know about the statute. Consider an employer eager to revive the workplace gender roles of the 1950s. He enforces a policy that he will hire only men as mechanics and only women as secretaries. When a qualified woman applies for a mechanic position and is denied, the "simple test" immediately spots the discrimination: A qualified man would have been given the job, so sex was a but-for cause of the employer's refusal to hire. But like the employers before us today, this employer would say not so fast. By comparing the woman who applied to be a mechanic to a man who applied to be a mechanic, we've quietly changed two things: the applicant's sex and her trait of failing to conform to 1950s gender roles. The "simple test" thus overlooks that it is really the applicant's bucking of 1950s gender roles, not her sex, *1749 doing the work. So we need to hold that second trait constant: Instead of comparing the disappointed female applicant to a man who applied for the same position, the employer would say, we should compare her to a man who applied to be a secretary. And because that jobseeker would be refused too, this must not be sex discrimination.
No one thinks that , so the employers must scramble to justify deploying a stricter causation test for use only in cases involving discrimination based on sexual orientation or transgender status. Such a rule would create a curious discontinuity in our case law, to put it mildly. Employer hires based on sexual stereotypes? Simple test. Employer sets pension contributions based on sex? Simple test. Employer fires men who do not behave in a sufficiently masculine way around the office? Simple test. But when that same employer discriminates against women who are attracted to women, or persons identified at birth as women who later identify as men, we suddenly roll out a new and more rigorous standard? Why are these reasons for taking sex into account different from all the rest? Title VII's text can offer no answer.
B
Ultimately, the employers are forced to abandon the statutory text and precedent altogether and appeal to assumptions and policy. Most pointedly, they contend that few in 1964 would have expected Title VII to apply to discrimination against homosexual and transgender persons. And whatever the text and our precedent indicate, they say, shouldn't this fact cause us to pause before recognizing liability?
It might be tempting to reject this argument out of hand. This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration. See, e.g. , Carcieri v. Salazar , 555 U.S. 379, 387, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009) ; Connecticut Nat. Bank v. Germain , 503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ; Rubin v. United States , 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). Of course, some Members of this Court have consulted legislative history when interpreting ambiguous statutory language. Cf. post , at 1775 (ALITO, J., dissenting). But that has no bearing here. "Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." Milner v. Department of Navy , 562 U.S. 562, 574, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011). And as we have seen, no ambiguity exists about how Title VII's terms apply to the facts before us. To be sure, the statute's application in these cases reaches "beyond the principal evil" legislators may have intended or expected to address. Oncale , 523 U.S. at 79, 118 S.Ct. 998. But " 'the fact that [a statute] has been applied in situations not expressly anticipated by Congress' " does not demonstrate ambiguity; instead, it simply " 'demonstrates [the] breadth' " of a legislative command. Sedima , S.P.R.L. v. Imrex Co ., 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). And "it is ultimately the provisions of " those legislative commands "rather than the principal concerns of our legislators by which we are governed." Oncale , 523 U.S. at 79, 118 S.Ct. 998 ; see also A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) (noting that unexpected applications of broad language reflect only Congress's "presumed point [to] produce general coverage-not to leave room for courts to recognize ad hoc exceptions").
*1750 Still, while legislative history can never defeat unambiguous statutory text, historical sources can be useful for a different purpose: Because the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context. And we must be attuned to the possibility that a statutory phrase ordinarily bears a different meaning than the terms do when viewed individually or literally. To ferret out such shifts in linguistic usage or subtle distinctions between literal and ordinary meaning, this Court has sometimes consulted the understandings of the law's drafters as some (not always conclusive) evidence. For example, in the context of the National Motor Vehicle Theft Act, this Court admitted that the term "vehicle" in 1931 could literally mean "a conveyance working on land, water or air." McBoyle v. United States , 283 U.S. 25, 26, 51 S.Ct. 340, 75 L.Ed. 816 (1931). But given contextual clues and "everyday speech" at the time of the Act's adoption in 1919, this Court concluded that "vehicles" in that statute included only things "moving on land," not airplanes too. Ibid . Similarly, in New Prime , we held that, while the term "contracts of employment" today might seem to encompass only contracts with employees, at the time of the statute's adoption the phrase was ordinarily understood to cover contracts with independent contractors as well. 586 U.S., at 1825 - 1826, 139 S.Ct., at 538-540. Cf. post, at ---- - ---- (KAVANAUGH, J., dissenting) (providing additional examples).
The employers, however, advocate nothing like that here. They do not seek to use historical sources to illustrate that the meaning of any of Title VII's language has changed since 1964 or that the statute's terms, whether viewed individually or as a whole, ordinarily carried some message we have missed. To the contrary, as we have seen, the employers agree with our understanding of all the statutory language-"discriminate against any individual ... because of such individual's ... sex." Nor do the competing dissents offer an alternative account about what these terms mean either when viewed individually or in the aggregate. Rather than suggesting that the statutory language bears some other meaning , the employers and dissents merely suggest that, because few in 1964 expected today's result , we should not dare to admit that it follows ineluctably from the statutory text. When a new application emerges that is both unexpected and important, they would seemingly have us merely point out the question, refer the subject back to Congress, and decline to enforce the plain terms of the law in the meantime.
That is exactly the sort of reasoning this Court has long rejected. Admittedly, the employers take pains to couch their argument in terms of seeking to honor the statute's "expected applications" rather than vindicate its "legislative intent." But the concepts are closely related. One could easily contend that legislators only intended expected applications or that a statute's purpose is limited to achieving applications foreseen at the time of enactment. However framed, the employer's logic impermissibly seeks to displace the plain meaning of the law in favor of something lying beyond it.
If anything, the employers' new framing may only add new problems. The employers assert that "no one" in 1964 or for some time after would have anticipated today's result. But is that really true? Not long after the law's passage, gay and transgender employees began filing Title VII complaints, so at least some people *1751 foresaw this potential application. See, e.g. , Smith v. Liberty Mut. Ins. Co. , 395 F.Supp. 1098, 1099 (ND Ga. 1975) (addressing claim from 1969); Holloway v. Arthur Andersen & Co. , 566 F.2d 659, 661 (CA9 1977) (addressing claim from 1974). And less than a decade after Title VII's passage, during debates over the Equal Rights Amendment, others counseled that its language-which was strikingly similar to Title VII's-might also protect homosexuals from discrimination. See, e.g. , Note, The Legality of Homosexual Marriage, 82 Yale L. J. 573, 583-584 (1973).
Why isn't that enough to demonstrate that today's result isn't totally unexpected? How many people have to foresee the application for it to qualify as "expected"? Do we look only at the moment the statute was enacted, or do we allow some time for the implications of a new statute to be worked out? Should we consider the expectations of those who had no reason to give a particular application any thought or only those with reason to think about the question? How do we account for those who change their minds over time, after learning new facts or hearing a new argument? How specifically or generally should we frame the "application" at issue? None of these questions have obvious answers, and the employers don't propose any.
One could also reasonably fear that objections about unexpected applications will not be deployed neutrally. Often lurking just behind such objections resides a cynicism that Congress could not possibly have meant to protect a disfavored group. Take this Court's encounter with the Americans with Disabilities Act's directive that no " 'public entity' " can discriminate against any " 'qualified individual with a disability.' " Pennsylvania Dept. of Corrections v. Yeskey , 524 U.S. 206, 208, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). Congress, of course, didn't list every public entity the statute would apply to. And no one batted an eye at its application to, say, post offices. But when the statute was applied to prisons , curiously, some demanded a closer look: Pennsylvania argued that "Congress did not 'envisio[n] that the ADA would be applied to state prisoners.' " Id ., at 211-212, 118 S.Ct. 1952. This Court emphatically rejected that view, explaining that, "in the context of an unambiguous statutory text," whether a specific application was anticipated by Congress "is irrelevant." Id. , at 212, 118 S.Ct. 1952. As Yeskey and today's cases exemplify, applying protective laws to groups that were politically unpopular at the time of the law's passage-whether prisoners in the 1990s or homosexual and transgender employees in the 1960s-often may be seen as unexpected. But to refuse enforcement just because of that, because the parties before us happened to be unpopular at the time of the law's passage, would not only require us to abandon our role as interpreters of statutes; it would tilt the scales of justice in favor of the strong or popular and neglect the promise that all persons are entitled to the benefit of the law's terms. Cf. post , at 1769 - 1773 (ALITO, J., dissenting); post, at 1833 - 1834 (KAVANAUGH, J., dissenting).
The employer's position also proves too much. If we applied Title VII's plain text only to applications some (yet-to-be-determined) group expected in 1964, we'd have more than a little law to overturn. Start with Oncale . How many people in 1964 could have expected that the law would turn out to protect male employees? Let alone to protect them from harassment by other male employees? As we acknowledged at the time, "male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII." 523 U.S. at 79, 118 S.Ct. 998. Yet the Court did not hesitate to recognize that *1752 Title VII's plain terms forbade it. Under the employer's logic, it would seem this was a mistake.
That's just the beginning of the law we would have to unravel. As one Equal Employment Opportunity Commission (EEOC) Commissioner observed shortly after the law's passage, the words of " 'the sex provision of Title VII [are] difficult to ... control.' " Franklin, Inventing the "Traditional Concept" of Sex Discrimination, 125 Harv. L. Rev. 1307, 1338 (2012) (quoting Federal Mediation Service To Play Role in Implementing Title VII, [1965-1968 Transfer Binder] CCH Employment Practices ¶8046, p. 6074). The "difficult[y]" may owe something to the initial proponent of the sex discrimination rule in Title VII, Representative Howard Smith. On some accounts, the congressman may have wanted (or at least was indifferent to the possibility of) broad language with wide-ranging effect. Not necessarily because he was interested in rooting out sex discrimination in all its forms, but because he may have hoped to scuttle the whole Civil Rights Act and thought that adding language covering sex discrimination would serve as a poison pill. See C. Whalen & B. Whalen, The Longest Debate: A Legislative History of the 1964 Civil Rights Act 115-118 (1985). Certainly nothing in the meager legislative history of this provision suggests it was meant to be read narrowly.
Whatever his reasons, thanks to the broad language Representative Smith introduced, many, maybe most, applications of Title VII's sex provision were "unanticipated" at the time of the law's adoption. In fact, many now-obvious applications met with heated opposition early on, even among those tasked with enforcing the law. In the years immediately following Title VII's passage, the EEOC officially opined that listing men's positions and women's positions separately in job postings was simply helpful rather than discriminatory. Franklin, 125 Harv. L. Rev., at 1340 (citing Press Release, EEOC (Sept. 22, 1965)). Some courts held that Title VII did not prevent an employer from firing an employee for refusing his sexual advances. See, e.g. , Barnes v. Train , 1974 WL 10628, *1 (D DC, Aug. 9, 1974). And courts held that a policy against hiring mothers but not fathers of young children wasn't discrimination because of sex. See Phillips v. Martin Marietta Corp. , 411 F.2d 1 (CA5 1969), rev'd, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam ).
Over time, though, the breadth of the statutory language proved too difficult to deny. By the end of the 1960s, the EEOC reversed its stance on sex-segregated job advertising. See Franklin, 125 Harv. L. Rev., at 1345. In 1971, this Court held that treating women with children differently from men with children violated Title VII. Phillips , 400 U.S. at 544, 91 S.Ct. 496. And by the late 1970s, courts began to recognize that sexual harassment can sometimes amount to sex discrimination. See, e.g. , Barnes v. Costle , 561 F.2d 983, 990 (CADC 1977). While to the modern eye each of these examples may seem "plainly [to] constitut[e] discrimination because of biological sex," post , at 1774 - 1775 (ALITO, J., dissenting), all were hotly contested for years following Title VII's enactment. And as with the discrimination we consider today, many federal judges long accepted interpretations of Title VII that excluded these situations. Cf. post , at 1833 - 1834 (KAVANAUGH, J., dissenting) (highlighting that certain lower courts have rejected Title VII claims based on homosexuality and transgender status). Would the employers have us undo every one of these unexpected applications too?
*1753 The weighty implications of the employers' argument from expectations also reveal why they cannot hide behind the no-elephants-in-mouseholes canon. That canon recognizes that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." Whitman v. American Trucking Assns. , Inc., 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). But it has no relevance here. We can't deny that today's holding-that employers are prohibited from firing employees on the basis of homosexuality or transgender status-is an elephant. But where's the mousehole? Title VII's prohibition of sex discrimination in employment is a major piece of federal civil rights legislation. It is written in starkly broad terms. It has repeatedly produced unexpected applications, at least in the view of those on the receiving end of them. Congress's key drafting choices-to focus on discrimination against individuals and not merely between groups and to hold employers liable whenever sex is a but-for cause of the plaintiff 's injuries-virtually guaranteed that unexpected applications would emerge over time. This elephant has never hidden in a mousehole; it has been standing before us all along.
With that, the employers are left to abandon their concern for expected applications and fall back to the last line of defense for all failing statutory interpretation arguments: naked policy appeals. If we were to apply the statute's plain language, they complain, any number of undesirable policy consequences would follow. Cf. post , at 1778 - 1784 (ALITO, J., dissenting). Gone here is any pretense of statutory interpretation; all that's left is a suggestion we should proceed without the law's guidance to do as we think best. But that's an invitation no court should ever take up. The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress. When it comes to statutory interpretation, our role is limited to applying the law's demands as faithfully as we can in the cases that come before us. As judges we possess no special expertise or authority to declare for ourselves what a self-governing people should consider just or wise. And the same judicial humility that requires us to refrain from adding to statutes requires us to refrain from diminishing them.
What are these consequences anyway? The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind. The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual "because of such individual's sex." As used in Title VII, the term " 'discriminate against' " refers to "distinctions or differences in treatment that injure protected individuals." Burlington N. & S.F.R. , 548 U.S. at 59, 126 S.Ct. 2405. Firing employees because of a statutorily protected trait surely counts. Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these.
Separately, the employers fear that complying with Title VII's requirement in cases like ours may require some employers to violate their religious convictions.
*1754 We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society. But worries about how Title VII may intersect with religious liberties are nothing new; they even predate the statute's passage. As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations. § 2000e-1(a). This Court has also recognized that the First Amendment can bar the application of employment discrimination laws "to claims concerning the employment relationship between a religious institution and its ministers." Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC , 565 U.S. 171, 188, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012). And Congress has gone a step further yet in the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, codified at 42 U.S.C. § 2000bb et seq. That statute prohibits the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest. § 2000bb-1. Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases. See § 2000bb-3.
But how these doctrines protecting religious liberty interact with Title VII are questions for future cases too. Harris Funeral Homes did unsuccessfully pursue a RFRA-based defense in the proceedings below. In its certiorari petition, however, the company declined to seek review of that adverse decision, and no other religious liberty claim is now before us. So while other employers in other cases may raise free exercise arguments that merit careful consideration, none of the employers before us today represent in this Court that compliance with Title VII will infringe their own religious liberties in any way.
*
Some of those who supported adding language to Title VII to ban sex discrimination may have hoped it would derail the entire Civil Rights Act. Yet, contrary to those intentions, the bill became law. Since then, Title VII's effects have unfolded with far-reaching consequences, some likely beyond what many in Congress or elsewhere expected.
But none of this helps decide today's cases. Ours is a society of written laws. Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations. In Title VII, Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee. We do not hesitate to recognize today a necessary consequence of that legislative choice: An employer who fires an individual merely for being gay or transgender defies the law.
The judgments of the Second and Sixth Circuits in Nos. 17-1623 and 18-107 are affirmed. The judgment of the Eleventh Circuit in No. 17-1618 is reversed, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.
Justice ALITO, with whom Justice THOMAS joins, dissenting.
There is only one word for what the Court has done today: legislation. The document that the Court releases is in the form of a judicial opinion interpreting a statute, but that is deceptive.
Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on *1755 any of five specified grounds: "race, color, religion, sex, [and] national origin." 42 U.S.C. § 2000e-2(a)(1). Neither "sexual orientation" nor "gender identity" appears on that list. For the past 45 years, bills have been introduced in Congress to add "sexual orientation" to the list,[1] and in recent years, bills have included "gender identity" as well.[2] But to date, none has passed both Houses.
Last year, the House of Representatives passed a bill that would amend Title VII by defining sex discrimination to include both "sexual orientation" and "gender identity," H.R. 5, 116th Cong., 1st Sess. (2019), but the bill has stalled in the Senate. An alternative bill, H.R. 5331, 116th Cong., 1st Sess. (2019), would add similar prohibitions but contains provisions to protect religious liberty.[3] This bill remains before a House Subcommittee.
Because no such amendment of Title VII has been enacted in accordance with the requirements in the Constitution (passage in both Houses and presentment to the President, Art. I, § 7, cl. 2), Title VII's prohibition of discrimination because of "sex" still means what it has always meant. But the Court is not deterred by these constitutional niceties. Usurping the constitutional authority of the other branches, the Court has essentially taken H.R. 5's provision on employment discrimination and issued it under the guise of statutory interpretation.[4] A more brazen abuse of our authority to interpret statutes is hard to recall.
The Court tries to convince readers that it is merely enforcing the terms of the statute, but that is preposterous. Even as understood today, the concept of discrimination because of "sex" is different from discrimination because of "sexual orientation" or "gender identity." And in any event, our duty is to interpret statutory terms to "mean what they conveyed to reasonable people at the time they were written ." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 16 (2012) (emphasis added). If every single living American had been surveyed in 1964, it would have been hard to find any who thought that discrimination because of sex meant discrimination because of sexual orientation--not to mention gender identity, a concept that was essentially unknown at the time.
The Court attempts to pass off its decision as the inevitable product of the textualist school of statutory interpretation championed by our late colleague Justice Scalia, but no one should be fooled. The Court's opinion is like a pirate ship. It sails under a textualist flag, but what it actually *1756 represents is a theory of statutory interpretation that Justice Scalia excoriated--the theory that courts should "update" old statutes so that they better reflect the current values of society. See A. Scalia, A Matter of Interpretation 22
(1997). If the Court finds it appropriate to adopt this theory, it should own up to what it is doing.[5]
Many will applaud today's decision because they agree on policy grounds with the Court's updating of Title VII. But the question in these cases is not whether discrimination because of sexual orientation or gender identity should be outlawed. The question is whether Congress did that in 1964 .
It indisputably did not.
I
A
Title VII, as noted, prohibits discrimination "because of ... sex," § 2000e-2(a)(1), and in 1964, it was as clear as clear could be that this meant discrimination because of the genetic and anatomical characteristics that men and women have at the time of birth. Determined searching has not found a single dictionary from that time that defined "sex" to mean sexual orientation, gender identity, or "transgender status."[6] Ante , at 1737. (Appendix A, infra , to this opinion includes the full definitions of "sex" in the unabridged dictionaries in use in the 1960s.)
In all those dictionaries, the primary definition of "sex" was essentially the same as that in the then-most recent edition of Webster's New International Dictionary 2296 (def. 1) (2d ed. 1953): "[o]ne of the two divisions of organisms formed on the distinction of male and female." See also American Heritage Dictionary 1187 (def. 1(a)) (1969) ("The property or quality by which organisms are classified according to their reproductive functions"); Random House Dictionary of the English Language 1307 (def. 1) (1966) (Random House Dictionary) ("the fact or character of being either male or female"); 9 Oxford English Dictionary 577 (def. 1) (1933) ("Either of the two divisions of organic beings distinguished as male and female respectively").
The Court does not dispute that this is what "sex" means in Title VII, although it coyly suggests that there is at least some support for a different and potentially relevant definition. Ante , at 1739. (I address alternative definitions below. See Part I-B-3, infra .) But the Court declines to stand on that ground and instead "proceed[s] on the assumption that 'sex' ...
*1757 refer[s] only to biological distinctions between male and female." Ante , at 1739.
If that is so, it should be perfectly clear that Title VII does not reach discrimination because of sexual orientation or gender identity. If "sex" in Title VII means biologically male or female, then discrimination because of sex means discrimination because the person in question is biologically male or biologically female, not because that person is sexually attracted to members of the same sex or identifies as a member of a particular gender.
How then does the Court claim to avoid that conclusion? The Court tries to cloud the issue by spending many pages discussing matters that are beside the point. The Court observes that a Title VII plaintiff need not show that "sex" was the sole or primary motive for a challenged employment decision or its sole or primary cause; that Title VII is limited to discrimination with respect to a list of specified actions (such as hiring, firing, etc.); and that Title VII protects individual rights, not group rights. See ante , at 1739 - 1741, 1742.
All that is true, but so what? In cases like those before us, a plaintiff must show that sex was a "motivating factor" in the challenged employment action, 42 U.S.C. § 2000e-2(m), so the question we must decide comes down to this: if an individual employee or applicant for employment shows that his or her sexual orientation or gender identity was a "motivating factor" in a hiring or discharge decision, for example, is that enough to establish that the employer discriminated "because of ... sex"? Or, to put the same question in different terms, if an employer takes an employment action solely because of the sexual orientation or gender identity of an employee or applicant, has that employer necessarily discriminated because of biological sex?
The answers to those questions must be no, unless discrimination because of sexual orientation or gender identity inherently constitutes discrimination because of sex. The Court attempts to prove that point, and it argues, not merely that the terms of Title VII can be interpreted that way but that they cannot reasonably be interpreted any other way . According to the Court, the text is unambiguous. See ante , at 1749 - 1750, 1751, 1752 - 1753.
The arrogance of this argument is breathtaking. As I will show, there is not a shred of evidence that any Member of Congress interpreted the statutory text that way when Title VII was enacted. See Part III-B, infra . But the Court apparently thinks that this was because the Members were not "smart enough to realize" what its language means. Hively v. Ivy Tech Community College of Ind. , 853 F.3d 339, 357 (CA7 2017) (Posner, J., concurring). The Court seemingly has the same opinion about our colleagues on the Courts of Appeals, because until 2017, every single Court of Appeals to consider the question interpreted Title VII's prohibition against sex discrimination to mean discrimination on the basis of biological sex. See Part III-C, infra . And for good measure, the Court's conclusion that Title VII unambiguously reaches discrimination on the basis of sexual orientation and gender identity necessarily means that the EEOC failed to see the obvious for the first 48 years after Title VII became law.[7] Day in *1758 and day out, the Commission enforced Title VII but did not grasp what discrimination "because of ... sex" unambiguously means. See Part III-C, infra .
The Court's argument is not only arrogant, it is wrong. It fails on its own terms. "Sex," "sexual orientation," and "gender identity" are different concepts, as the Court concedes. Ante , at 1746 - 1747 ("homosexuality and transgender status are distinct concepts from sex"). And neither "sexual orientation" nor "gender identity" is tied to either of the two biological sexes. See ante , at 1742 (recognizing that "discrimination on these bases" does not have "some disparate impact on one sex or another"). Both men and women may be attracted to members of the opposite sex, members of the same sex, or members of both sexes.[8] And individuals who are born with the genes and organs of either biological sex may identify with a different gender.[9]
Using slightly different terms, the Court asserts again and again that discrimination because of sexual orientation or gender identity inherently or necessarily entails discrimination because of sex. See ante , at 1737 (When an employer "fires an individual for being homosexual or transgender," "[s]ex plays a necessary and undisguisable role in the decision"); ante , at 1741 ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex"); ante , at 1742 ("[W]hen an employer discriminates against homosexual or transgender employees, [the] employer ... inescapably intends to rely on sex in its decisionmaking"); ante , at 1743 ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex"); ante , at 1744 ("When an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex"); ante , at 1747 ("[D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex"). But repetition of an assertion does not make it so, and the Court's repeated assertion is demonstrably untrue.
Contrary to the Court's contention, discrimination because of sexual orientation or gender identity does not in and of itself entail discrimination because of sex. We can see this because it is quite possible for an employer to discriminate on those grounds without taking the sex of an individual applicant or employee into account. An employer can have a policy that says: "We do not hire gays, lesbians, or transgender individuals." And an employer can implement this policy without paying any attention to or even knowing the biological sex of gay, lesbian, and transgender applicants. In fact, at the time of the enactment of Title VII, the United States military had a blanket policy of refusing to enlist gays *1759 or lesbians, and under this policy for years thereafter, applicants for enlistment were required to complete a form that asked whether they were "homosexual." Appendix D, infra , at 1803, 1816.
At oral argument, the attorney representing the employees, a prominent professor of constitutional law, was asked if there would be discrimination because of sex if an employer with a blanket policy against hiring gays, lesbians, and transgender individuals implemented that policy without knowing the biological sex of any job applicants. Her candid answer was that this would "not" be sex discrimination.[10] And she was right.
The attorney's concession was necessary, but it is fatal to the Court's interpretation, for if an employer discriminates against individual applicants or employees without even knowing whether they are male or female, it is impossible to argue that the employer intentionally discriminated because of sex. Contra, ante , at 1746 - 1747. An employer cannot intentionally discriminate on the basis of a characteristic of which the employer has no knowledge. And if an employer does not violate Title VII by discriminating on the basis of sexual orientation or gender identity without knowing the sex of the affected individuals, there is no reason why the same employer could not lawfully implement the same policy even if it knows the sex of these individuals. If an employer takes an adverse employment action for a perfectly legitimate reason-for example, because an employee stole company property-that action is not converted into sex discrimination simply because the employer knows the employee's sex. As explained, a disparate treatment case requires proof of intent-i.e., that the employee's sex motivated the firing. In short, what this example shows is that discrimination because of sexual orientation or gender identity does not inherently or necessarily entail discrimination because of sex, and for that reason, the Court's chief argument collapses.
Trying to escape the consequences of the attorney's concession, the Court offers its own hypothetical:
"Suppose an employer's application form offered a single box to check if the applicant is either black or Catholic. If the employer refuses to hire anyone who checks that box, would we conclude the employer has complied with Title VII, so long as it studiously avoids learning any particular applicant's race or religion? Of course not." Ante , at 1746.
How this hypothetical proves the Court's point is a mystery. A person who checked that box would presumably be black, Catholic, or both, and refusing to hire an applicant because of race or religion is prohibited by Title VII. Rejecting applicants who checked a box indicating that they are homosexual is entirely different because it is impossible to tell from that answer whether an applicant is male or female.
The Court follows this strange hypothetical with an even stranger argument. The Court argues that an applicant could not answer the question whether he or she is homosexual without knowing something about sex. If the applicant was unfamiliar with the term "homosexual," the applicant would have to look it up or ask what the term means. And because this applicant would have to take into account his or her sex and that of the persons to whom he or *1760 she is sexually attracted to answer the question, it follows, the Court reasons, that an employer could not reject this applicant without taking the applicant's sex into account. See ante , at 1746 - 1747.
This is illogical. Just because an applicant cannot say whether he or she is homosexual without knowing his or her own sex and that of the persons to whom the applicant is attracted, it does not follow that an employer cannot reject an applicant based on homosexuality without knowing the applicant's sex.
While the Court's imagined application form proves nothing, another hypothetical case offered by the Court is telling. But what it proves is not what the Court thinks. The Court posits:
"Imagine an employer who has a policy of firing any employee known to be homosexual. The employer hosts an office holiday party and invites employees to bring their spouses. A model employee arrives and introduces a manager to Susan, the employee's wife. Will that employee be fired? If the policy works as the employer intends, the answer depends entirely on whether the model employee is a man or a woman." Ante , at 1742.
This example disproves the Court's argument because it is perfectly clear that the employer's motivation in firing the female employee had nothing to do with that employee's sex. The employer presumably knew that this employee was a woman before she was invited to the fateful party. Yet the employer, far from holding her biological sex against her, rated her a "model employee." At the party, the employer learned something new, her sexual orientation, and it was this new information that motivated her discharge. So this is another example showing that discrimination because of sexual orientation does not inherently involve discrimination because of sex.
In addition to the failed argument just discussed, the Court makes two other arguments, more or less in passing. The first of these is essentially that sexual orientation and gender identity are closely related to sex. The Court argues that sexual orientation and gender identity are "inextricably bound up with sex," ante , at 1742, and that discrimination on the basis of sexual orientation or gender identity involves the application of "sex-based rules," ante , at 1745 - 1746. This is a variant of an argument found in many of the briefs filed in support of the employees and in the lower court decisions that agreed with the Court's interpretation. All these variants stress that sex, sexual orientation, and gender identity are related concepts. The Seventh Circuit observed that "[i]t would require considerable calisthenics to remove 'sex' from 'sexual orientation.' " Hively , 853 F.3d at 350.[11] The Second Circuit wrote that sex is necessarily "a factor in sexual orientation" and further concluded that "sexual orientation is a function of sex." 883 F.3d 100, 112-113 (CA2 2018) (en banc). Bostock's brief and those of amici supporting his position contend that sexual orientation is "a sex-based consideration."[12] Other briefs state that sexual orientation is "a function of sex"[13] or is *1761 "intrinsically related to sex."[14] Similarly, Stephens argues that sex and gender identity are necessarily intertwined: "By definition, a transgender person is someone who lives and identifies with a sex different than the sex assigned to the person at birth."[15]
It is curious to see this argument in an opinion that purports to apply the purest and highest form of textualism because the argument effectively amends the statutory text. Title VII prohibits discrimination because of sex itself, not everything that is related to, based on, or defined with reference to, "sex." Many things are related to sex. Think of all the nouns other than "orientation" that are commonly modified by the adjective "sexual." Some examples yielded by a quick computer search are "sexual harassment," "sexual assault," "sexual violence," "sexual intercourse," and "sexual content."
Does the Court really think that Title VII prohibits discrimination on all these grounds? Is it unlawful for an employer to refuse to hire an employee with a record of sexual harassment in prior jobs? Or a record of sexual assault or violence?
To be fair, the Court does not claim that Title VII prohibits discrimination because of everything that is related to sex. The Court draws a distinction between things that are "inextricably" related and those that are related in "some vague sense." Ante , at 1741 - 1742. Apparently the Court would graft onto Title VII some arbitrary line separating the things that are related closely enough and those that are not.[16] And it would do this in the name of high textualism. An additional argument made in passing also fights the text of Title VII and the policy it reflects. The Court proclaims that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." Ante , at 1741. That is the policy view of many people in 2020, and perhaps Congress would have amended Title VII to implement it if this Court had not intervened. But that is not the policy embodied in Title VII in its current form. Title VII prohibits discrimination based on five specified grounds, and neither sexual orientation nor gender identity is on the list. As long as an employer does not discriminate based on one of the listed grounds, the employer is free to decide for itself which characteristics are "relevant to [its] employment decisions." Ibid. By proclaiming that sexual orientation and gender identity are "not relevant to employment decisions," the Court updates Title VII to reflect what it regards as 2020 values.
The Court's remaining argument is based on a hypothetical that the Court finds instructive. In this hypothetical, an employer has two employees who are "attracted to men," and "to the employer's mind " the two employees are "materially identical" except that one is a man and the other is a woman. Ante , at 1741 (emphasis added). The Court reasons that if the employer fires the man but not the woman, the employer is necessarily motivated by the man's biological sex. Ante , at 1741 - 1742. After all, if two employees are identical in every respect but sex, and the employer *1762 fires only one, what other reason could there be?
The problem with this argument is that the Court loads the dice. That is so because in the mind of an employer who does not want to employ individuals who are attracted to members of the same sex, these two employees are not materially identical in every respect but sex. On the contrary, they differ in another way that the employer thinks is quite material. And until Title VII is amended to add sexual orientation as a prohibited ground, this is a view that an employer is permitted to implement. As noted, other than prohibiting discrimination on any of five specified grounds, "race, color, religion, sex, [and] national origin." 42 U.S.C. § 2000e-2(a)(1), Title VII allows employers to decide whether two employees are "materially identical." Even idiosyncratic criteria are permitted; if an employer thinks that Scorpios make bad employees, the employer can refuse to hire Scorpios. Such a policy would be unfair and foolish, but under Title VII, it is permitted. And until Title VII is amended, so is a policy against employing gays, lesbians, or transgender individuals.
Once this is recognized, what we have in the Court's hypothetical case are two employees who differ in two ways--sex and sexual orientation--and if the employer fires one and keeps the other, all that can be inferred is that the employer was motivated either entirely by sexual orientation, entirely by sex, or in part by both. We cannot infer with any certainty, as the hypothetical is apparently meant to suggest, that the employer was motivated even in part by sex. The Court harps on the fact that under Title VII a prohibited ground need not be the sole motivation for an adverse employment action, see ante , at 1741 - 1742, 1743 - 1745, 1747 - 1748, but its example does not show that sex necessarily played any part in the employer's thinking.
The Court tries to avoid this inescapable conclusion by arguing that sex is really the only difference between the two employees. This is so, the Court maintains, because both employees "are attracted to men." Ante , at 1741 - 1742. Of course, the employer would couch its objection to the man differently. It would say that its objection was his sexual orientation. So this may appear to leave us with a battle of labels. If the employer's objection to the male employee is characterized as attraction to men, it seems that he is just like the woman in all respects except sex and that the employer's disparate treatment must be based on that one difference. On the other hand, if the employer's objection is sexual orientation or homosexuality, the two employees differ in two respects, and it cannot be inferred that the disparate treatment was due even in part to sex.
The Court insists that its label is the right one, and that presumably is why it makes such a point of arguing that an employer cannot escape liability under Title VII by giving sex discrimination some other name. See ante , at 1743 - 1744, 1745 - 1746. That is certainly true, but so is the opposite. Something that is not sex discrimination cannot be converted into sex discrimination by slapping on that label. So the Court cannot prove its point simply by labeling the employer's objection as "attract[ion] to men." Ante , at 1741 - 1742. Rather, the Court needs to show that its label is the correct one.
And a labeling standoff would not help the Court because that would mean that the bare text of Title VII does not unambiguously show that its interpretation is right. The Court would have no justification for its stubborn refusal to look any further.
*1763 As it turns out, however, there is no standoff. It can easily be shown that the employer's real objection is not "attract[ion] to men" but homosexual orientation.
In an effort to prove its point, the Court carefully includes in its example just two employees, a homosexual man and a heterosexual woman, but suppose we add two more individuals, a woman who is attracted to women and a man who is attracted to women. (A large employer will likely have applicants and employees who fall into all four categories, and a small employer can potentially have all four as well.) We now have the four exemplars listed below, with the discharged employees crossed out:
Man attracted to men
Woman attracted to men
Woman attracted to women
Man attracted to women
The discharged employees have one thing in common. It is not biological sex, attraction to men, or attraction to women. It is attraction to members of their own sex-in a word, sexual orientation. And that, we can infer, is the employer's real motive.
In sum, the Court's textual arguments fail on their own terms. The Court tries to prove that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," ante, at 1741, but as has been shown, it is entirely possible for an employer to do just that. "[H]omosexuality and transgender status are distinct concepts from sex," ante , at 1746 - 1747, and discrimination because of sexual orientation or transgender status does not inherently or necessarily constitute discrimination because of sex. The Court's arguments are squarely contrary to the statutory text.
But even if the words of Title VII did not definitively refute the Court's interpretation, that would not justify the Court's refusal to consider alternative interpretations. The Court's excuse for ignoring everything other than the bare statutory text is that the text is unambiguous and therefore no one can reasonably interpret the text in any way other than the Court does. Unless the Court has met that high standard, it has no justification for its blinkered approach. And to say that the Court's interpretation is the only possible reading is indefensible.
B
Although the Court relies solely on the arguments discussed above, several other arguments figure prominently in the decisions of the lower courts and in briefs submitted by or in support of the employees. The Court apparently finds these arguments unpersuasive, and so do I, but for the sake of completeness, I will address them briefly.
1
One argument, which relies on our decision in Price Waterhouse v. Hopkins , 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion), is that discrimination because of sexual orientation or gender identity violates Title VII because it constitutes prohibited discrimination on the basis of sex stereotypes. See 883 F.3d at 119-123 ; Hively , 853 F.3d at 346 ; 884 F.3d 560, 576-577 (CA6 2018). The argument goes like this. Title VII prohibits discrimination based on stereotypes about the way men and women should behave; the belief that a person should be attracted only to persons of the opposite sex and the belief that a person should identify with his or her biological sex are examples of such stereotypes; therefore, discrimination on either of these grounds is unlawful.
*1764 This argument fails because it is based on a faulty premise, namely, that Title VII forbids discrimination based on sex stereotypes. It does not. It prohibits discrimination because of "sex," and the two concepts are not the same. See Price Waterhouse , 490 U.S. at 251, 109 S.Ct. 1775. That does not mean, however, that an employee or applicant for employment cannot prevail by showing that a challenged decision was based on a sex stereotype. Such evidence is relevant to prove discrimination because of sex, and it may be convincing where the trait that is inconsistent with the stereotype is one that would be tolerated and perhaps even valued in a person of the opposite sex. See ibid.
Much of the plaintiff 's evidence in Price Waterhouse was of this nature. The plaintiff was a woman who was passed over for partnership at an accounting firm, and some of the adverse comments about her work appeared to criticize her for being forceful and insufficiently "feminin[e]." Id. , at 235-236, 109 S.Ct. 1775.
The main issue in Price Waterhouse --the proper allocation of the burdens of proof in a so-called mixed motives Title VII case-is not relevant here, but the plurality opinion, endorsed by four Justices, commented on the issue of sex stereotypes. The plurality observed that "sex stereotypes do not inevitably prove that gender played a part in a particular employment decision" but "can certainly be evidence that gender played a part." Id. , at 251, 109 S.Ct. 1775.[17] And the plurality made it clear that "[t]he plaintiff must show that the employer actually relied on her gender in making its decision." Ibid.
Plaintiffs who allege that they were treated unfavorably because of their sexual orientation or gender identity are not in the same position as the plaintiff in Price Waterhouse . In cases involving discrimination based on sexual orientation or gender identity, the grounds for the employer's decision-that individuals should be sexually attracted only to persons of the opposite biological sex or should identify with their biological sex-apply equally to men and women. "[H]eterosexuality is not a female stereotype; it not a male stereotype; it is not a sexspecific stereotype at all." Hively , 853 F.3d at 370 (Sykes, J., dissenting).
To be sure, there may be cases in which a gay, lesbian, or transgender individual can make a claim like the one in Price Waterhouse . That is, there may be cases where traits or behaviors that some people associate with gays, lesbians, or transgender individuals are tolerated or valued in persons of one biological sex but not the other. But that is a different matter.
2
A second prominent argument made in support of the result that the Court now reaches analogizes discrimination against gays and lesbians to discrimination against a person who is married to or has an intimate relationship with a person of a different race. Several lower court cases have held that discrimination on this ground violates Title VII. See, e.g. , Holcomb v. Iona College , 521 F.3d 130 (CA2 2008) ; Parr v. Woodmen of World Life Ins. Co. , 791 F.2d 888 (CA11 1986). And the *1765 logic of these decisions, it is argued, applies equally where an employee or applicant is treated unfavorably because he or she is married to, or has an intimate relationship with, a person of the same sex.
This argument totally ignores the historically rooted reason why discrimination on the basis of an interracial relationship constitutes race discrimination. And without taking history into account, it is not easy to see how the decisions in question fit the terms of Title VII.
Recall that Title VII makes it unlawful for an employer to discriminate against an individual "because of such individual's race ." 42 U.S.C. § 2000e-2(a) (emphasis added). So if an employer is happy to employ whites and blacks but will not employ any employee in an interracial relationship, how can it be said that the employer is discriminating against either whites or blacks "because of such individual's race"? This employer would be applying the same rule to all its employees regardless of their race.
The answer is that this employer is discriminating on a ground that history tells us is a core form of race discrimination.[18] "It would require absolute blindness to the history of racial discrimination in this country not to understand what is at stake in such cases .... A prohibition on 'race-mixing' was ... grounded in bigotry against a particular race and was an integral part of preserving the rigid hierarchical distinction that denominated members of the black race as inferior to whites." 883 F.3d at 158-159 (Lynch, J., dissenting).
Discrimination because of sexual orientation is different. It cannot be regarded as a form of sex discrimination on the ground that applies in race cases since discrimination because of sexual orientation is not historically tied to a project that aims to subjugate either men or women. An employer who discriminates on this ground might be called "homophobic" or "transphobic," but not sexist. See Wittmer v. Phillips 66 Co. , 915 F.3d 328, 338 (CA5 2019) (Ho, J., concurring).
3
The opinion of the Court intimates that the term "sex" was not universally understood in 1964 to refer just to the categories of male and female, see ante , at 1739, and while the Court does not take up any alternative definition as a ground for its decision, I will say a word on this subject.
As previously noted, the definitions of "sex" in the unabridged dictionaries in use in the 1960s are reproduced in Appendix A, infra . Anyone who examines those definitions can see that the primary definition in every one of them refers to the division of living things into two groups, male and female, based on biology, and most of the definitions further down the list are the same or very similar. In addition, some definitions refer to heterosexual sex acts. See Random House Dictionary 1307 ("coitus," "sexual intercourse" (defs. 5-6)); American Heritage Dictionary, at 1187 ("sexual intercourse" (def. 5)).[19]
*1766 Aside from these, what is there? One definition, "to neck passionately," Random House Dictionary 1307 (def. 8), refers to sexual conduct that is not necessarily heterosexual. But can it be seriously argued that one of the aims of Title VII is to outlaw employment discrimination against employees, whether heterosexual or homosexual, who engage in necking? And even if Title VII had that effect, that is not what is at issue in cases like those before us.
That brings us to the two remaining subsidiary definitions, both of which refer to sexual urges or instincts and their manifestations. See the fourth definition in the American Heritage Dictionary, at 1187 ("the sexual urge or instinct as it manifests itself in behavior"), and the fourth definition in both Webster's Second and Third ("[p]henomena of sexual instincts and their manifestations," Webster's New International Dictionary, at 2296 (2d ed.); Webster's Third New International Dictionary 2081 (1966)). Since both of these come after three prior definitions that refer to men and women, they are most naturally read to have the same association, and in any event, is it plausible that Title VII prohibits discrimination based on any sexual urge or instinct and its manifestations? The urge to rape?
Viewing all these definitions, the overwhelming impact is that discrimination because of "sex" was understood during the era when Title VII was enacted to refer to men and women. (The same is true of current definitions, which are reproduced in Appendix B, infra .) This no doubt explains why neither this Court nor any of the lower courts have tried to make much of the dictionary definitions of sex just discussed.
II
A
So far, I have not looked beyond dictionary definitions of "sex," but textualists like Justice Scalia do not confine their inquiry to the scrutiny of dictionaries. See Manning, Textualism and the Equity of the Statute, 101 Colum. L. Rev. 1, 109 (2001). Dictionary definitions are valuable because they are evidence of what people at the time of a statute's enactment would have understood its words to mean. Ibid. But they are not the only source of relevant evidence, and what matters in the end is the answer to the question that the evidence is gathered to resolve: How would the terms of a statute have been understood by ordinary people at the time of enactment?
Justice Scalia was perfectly clear on this point. The words of a law, he insisted, "mean what they conveyed to reasonable people at the time. " Reading Law, at 16 (emphasis added).[20]
Leading proponents of Justice Scalia's school of textualism have expounded on this principle and explained that it is grounded on an understanding of the way language works. As Dean John F. Manning explains, "the meaning of language depends on the way a linguistic community uses words and phrases in context." What Divides Textualists From Purposivists? 106 Colum. L. Rev. 70, 78 (2006). "[O]ne can make sense of others' communications only by placing them in their appropriate social and linguistic context," id ., at 79-80, and this is no less true of statutes than any other verbal communications. "[S]tatutes convey meaning only because members of a relevant linguistic community apply shared background conventions for understanding *1767 how particular words are used in particular contexts." Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2457 (2003). Therefore, judges should ascribe to the words of a statute "what a reasonable person conversant with applicable social conventions would have understood them to be adopting." Manning, 106 Colum. L. Rev., at 77. Or, to put the point in slightly different terms, a judge interpreting a statute should ask " 'what one would ordinarily be understood as saying, given the circumstances in which one said it.' " Manning, 116 Harv. L. Rev., at 2397-2398.
Judge Frank Easterbrook has made the same points:
"Words are arbitrary signs, having meaning only to the extent writers and readers share an understanding.... Language in general, and legislation in particular, is a social enterprise to which both speakers and listeners contribute, drawing on background understandings and the structure and circumstances of the utterance." Herrmann v. Cencom Cable Assocs., Inc. , 978 F.2d 978, 982 (CA7 1992).
Consequently, "[s]licing a statute into phrases while ignoring ... the setting of the enactment ... is a formula for disaster." Ibid . ; see also Continental Can Co. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund , 916 F.2d 1154, 1157 (CA7 1990) ("You don't have to be Ludwig Wittgenstein or Hans-Georg Gadamer to know that successful communication depends on meanings shared by interpretive communities").
Thus, when textualism is properly understood, it calls for an examination of the social context in which a statute was enacted because this may have an important bearing on what its words were understood to mean at the time of enactment. Textualists do not read statutes as if they were messages picked up by a powerful radio telescope from a distant and utterly unknown civilization. Statutes consist of communications between members of a particular linguistic community, one that existed in a particular place and at a particular time, and these communications must therefore be interpreted as they were understood by that community at that time.
For this reason, it is imperative to consider how Americans in 1964 would have understood Title VII's prohibition of discrimination because of sex. To get a picture of this, we may imagine this scene. Suppose that, while Title VII was under consideration in Congress, a group of average Americans decided to read the text of the bill with the aim of writing or calling their representatives in Congress and conveying their approval or disapproval. What would these ordinary citizens have taken "discrimination because of sex" to mean? Would they have thought that this language prohibited discrimination because of sexual orientation or gender identity?
B
The answer could not be clearer. In 1964, ordinary Americans reading the text of Title VII would not have dreamed that discrimination because of sex meant discrimination because of sexual orientation, much less gender identity. The ordinary meaning of discrimination because of "sex" was discrimination because of a person's biological sex, not sexual orientation or gender identity. The possibility that discrimination on either of these grounds might fit within some exotic understanding of sex discrimination would not have crossed their minds.
1
In 1964, the concept of prohibiting discrimination "because of sex" was no novelty.
*1768 It was a familiar and well-understood concept, and what it meant was equal treatment for men and women.
Long before Title VII was adopted, many pioneering state and federal laws had used language substantively indistinguishable from Title VII's critical phrase, "discrimination because of sex." For example, the California Constitution of 1879 stipulated that no one, "on account of sex , [could] be disqualified from entering upon or pursuing any lawful business, vocation, or profession." Art. XX, § 18 (emphasis added). It also prohibited a student's exclusion from any state university department "on account of sex." Art. IX, § 9; accord, Mont. Const., Art. XI, § 9 (1889).
Wyoming's first Constitution proclaimed broadly that "[b]oth male and female citizens of this state shall equally enjoy all civil, political and religious rights and privileges," Art. VI, § 1 (1890), and then provided specifically that "[i]n none of the public schools ... shall distinction or discrimination be made on account of sex ," Art. VII, § 10 (emphasis added); see also § 16 (the "university shall be equally open to students of both sexes"). Washington's Constitution likewise required "ample provision for the education of all children ... without distinction or preference on account of ... sex ." Art. IX, § 1 (1889) (emphasis added).
The Constitution of Utah, adopted in 1895, provided that the right to vote and hold public office "shall not be denied or abridged on account of sex ." Art. IV, § 1 (emphasis added). And in the next sentence it made clear what "on account of sex" meant, stating that "[b]oth male and female citizens ... shall enjoy equally all civil, political and religious rights and privileges." Ibid .
The most prominent example of a provision using this language was the Nineteenth Amendment, ratified in 1920, which bans the denial or abridgment of the right to vote "on account of sex." U.S. Const., Amdt. 19. Similar language appeared in the proposal of the National Woman's Party for an Equal Rights Amendment. As framed in 1921, this proposal forbade all "political, civil or legal disabilities or inequalities on account of sex , [o]r on account of marriage." Women Lawyers Meet: Representatives of 20 States Endorse Proposed Equal Rights Amendment, N. Y. Times, Sept. 16, 1921, p. 10.
Similar terms were used in the precursor to the Equal Pay Act. Introduced in 1944 by Congresswoman Winifred C. Stanley, it proclaimed that "[d]iscrimination against employees, in rates of compensation paid, on account of sex " was "contrary to the public interest." H.R. 5056, 78th Cong., 2d Sess.
In 1952, the new Constitution for Puerto Rico, which was approved by Congress, 66 Stat. 327, prohibited all "discrimination ... on account of ... sex ," Art. II, Bill of Rights § 1 (emphasis added), and in the landmark Immigration and Nationality Act of 1952, Congress outlawed discrimination in naturalization "because of ... sex ." 8 U.S.C. § 1422 (emphasis added).
In 1958, the International Labour Organisation, a United Nations agency of which the United States is a member, recommended that nations bar employment discrimination "made on the basis of ... sex ." Convention (No. 111) Concerning Discrimination in Respect of Employment and Occupation, Art. 1(a), June 25, 1958, 362 U. N. T. S. 32 (emphasis added).
In 1961, President Kennedy ordered the Civil Service Commission to review and modify personnel policies "to assure that selection for any career position is hereinafter made solely on the basis of individual *1769 merit and fitness, without regard to sex ."[21] He concurrently established a "Commission on the Status of Women" and directed it to recommend policies "for overcoming discriminations in government and private employment on the basis of sex ." Exec. Order No. 10980, 3 CFR 138 (1961 Supp.) (emphasis added).
In short, the concept of discrimination "because of," "on account of," or "on the basis of " sex was well understood. It was part of the campaign for equality that had been waged by women's rights advocates for more than a century, and what it meant was equal treatment for men and women.[22]
2
Discrimination "because of sex" was not understood as having anything to do with discrimination because of sexual orientation or transgender status. Any such notion would have clashed in spectacular fashion with the societal norms of the day.
For most 21st-century Americans, it is painful to be reminded of the way our society once treated gays and lesbians, but any honest effort to understand what the terms of Title VII were understood to mean when enacted must take into account the societal norms of that time. And the plain truth is that in 1964 homosexuality was thought to be a mental disorder, and homosexual conduct was regarded as morally culpable and worthy of punishment.
In its then-most recent Diagnostic and Statistical Manual of Mental Disorders (1952) (DSM-I), the American Psychiatric Association (APA) classified same-sex attraction as a "sexual deviation," a particular type of "sociopathic personality disturbance," id. , at 38-39, and the next edition, issued in 1968, similarly classified homosexuality as a "sexual deviatio[n]," Diagnostic and Statistical Manual of Mental Disorders 44 (2d ed.) (DSM-II). It was not until the sixth printing of the DSM-II in 1973 that this was changed.[23]
*1770 Society's treatment of homosexuality and homosexual conduct was consistent with this understanding. Sodomy was a crime in every State but Illinois, see W. Eskridge, Dishonorable Passions 387-407 (2008), and in the District of Columbia, a law enacted by Congress made sodomy a felony punishable by imprisonment for up to 10 years and permitted the indefinite civil commitment of "sexual psychopath[s]," Act of June 9, 1948, §§ 104, 201-207, 62 Stat. 347-349.[24]
This view of homosexuality was reflected in the rules governing the federal work force. In 1964, federal "[a]gencies could deny homosexual men and women employment because of their sexual orientation," and this practice continued until 1975. GAO, D. Heivilin, Security Clearances: Consideration of Sexual Orientation in the Clearance Process 2 (GAO/NSIAD-95-21, 1995). See, e.g. , Anonymous v. Macy , 398 F.2d 317, 318 (CA5 1968) (affirming dismissal of postal employee for homosexual acts).
In 1964, individuals who were known to be homosexual could not obtain security clearances, and any who possessed clearances were likely to lose them if their orientation was discovered. A 1953 Executive Order provided that background investigations should look for evidence of "sexual perversion," as well as "[a]ny criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct." Exec. Order No. 10450, § 8(a)(1)(iii), 3 CFR 938 (1949-1953 Comp.). "Until about 1991, when agencies began to change their security policies and practices regarding sexual orientation, there were a number of documented cases where defense civilian or contractor employees' security clearances were denied or revoked because of their sexual orientation." GAO, Security Clearances, at 2. See, e.g. , Adams v. Laird , 420 F.2d 230, 240 (CADC 1969) (upholding denial of security clearance to defense contractor employee because he had "engaged in repeated homosexual acts"); see also Webster v. Doe , 486 U.S. 592, 595, 601, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (concluding that decision to fire a particular individual because he was homosexual fell within the "discretion" of the Director of Central Intelligence under the National Security Act of 1947 and thus was unreviewable under the APA).
The picture in state employment was similar. In 1964, it was common for States to bar homosexuals from serving as teachers. An article summarizing the situation 15 years after Title VII became law reported that "[a]ll states have statutes that permit the revocation of teaching certificates (or credentials) for immorality, moral turpitude, or unprofessionalism," and, the survey added, "[h]omosexuality is considered to fall within all three categories."[25]
The situation in California is illustrative. California laws prohibited individuals who engaged in "immoral conduct" (which was construed to include homosexual behavior), as well as those convicted of "sex offenses" (like sodomy), from employment as teachers. Cal. Educ. Code Ann. §§ 13202, 13207, 13209, 13218, 13255 (West 1960). The teaching certificates of individuals convicted of engaging in homosexual acts were *1771 revoked. See, e.g. , Sarac v. State Bd. of Ed. , 249 Cal.App.2d 58, 62-64, 57 Cal.Rptr. 69, 72-73 (1967) (upholding revocation of secondary teaching credential from teacher who was convicted of engaging in homosexual conduct on public beach), overruled in part, Morrison v. State Bd. of Ed. , 1 Cal.3d 214, 461 P.2d 375, 82 Cal.Rptr. 175 (1969).
In Florida, the legislature enacted laws authorizing the revocation of teaching certificates for "misconduct involving moral turpitude," Fla. Stat. Ann. § 229.08(16) (1961), and this law was used to target homosexual conduct. In 1964, a legislative committee was wrapping up a 6-year campaign to remove homosexual teachers from public schools and state universities. As a result of these efforts, the state board of education apparently revoked at least 71 teachers' certificates and removed at least 14 university professors. Eskridge, Dishonorable Passions, at 103.
Individuals who engaged in homosexual acts also faced the loss of other occupational licenses, such as those needed to work as a "lawyer, doctor, mortician, [or] beautician."[26] See, e.g. , Florida Bar v. Kay , 232 So.2d 378 (Fla. 1970) (attorney disbarred after conviction for homosexual conduct in public bathroom).
In 1964 and for many years thereafter, homosexuals were barred from the military. See, e.g. , Army Reg. 635-89, § I(2) (a) (July 15, 1966) ("Personnel who voluntarily engage in homosexual acts, irrespective of sex, will not be permitted to serve in the Army in any capacity, and their prompt separation is mandatory"); Army Reg. 600-443, § I(2) (April 10, 1953) (similar). Prohibitions against homosexual conduct by members of the military were not eliminated until 2010. See Don't Ask, Don't Tell Repeal Act of 2010, 124 Stat. 3515 (repealing 10 U.S.C. § 654, which required members of the Armed Forces to be separated for engaging in homosexual conduct).
Homosexuals were also excluded from entry into the United States. The Immigration and Nationality Act of 1952 (INA) excluded aliens "afflicted with psychopathic personality." 8 U.S.C. § 1182(a)(4) (1964 ed.). In Boutilier v. INS , 387 U.S. 118, 120-123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967), this Court, relying on the INA's legislative history, interpreted that term to encompass homosexuals and upheld an alien's deportation on that ground. Three Justices disagreed with the majority's interpretation of the phrase "psychopathic personality."[27] But it apparently did not occur to anyone to argue that the Court's interpretation was inconsistent with the INA's express prohibition of discrimination "because of sex." That was how our society-and this Court-saw things a half century ago. Discrimination because of sex and discrimination because of sexual orientation were viewed as two entirely different concepts.
To its credit, our society has now come to recognize the injustice of past practices, and this recognition provides the impetus to "update" Title VII. But that is not our job. Our duty is to understand what the terms of Title VII were understood to mean when enacted, and in doing so, we must take into account the societal norms of that time. We must therefore ask *1772 whether ordinary Americans in 1964 would have thought that discrimination because of "sex" carried some exotic meaning under which private-sector employers would be prohibited from engaging in a practice that represented the official policy of the Federal Government with respect to its own employees. We must ask whether Americans at that time would have thought that Title VII banned discrimination against an employee for engaging in conduct that Congress had made a felony and a ground for civil commitment.
The questions answer themselves. Even if discrimination based on sexual orientation or gender identity could be squeezed into some arcane understanding of sex discrimination, the context in which Title VII was enacted would tell us that this is not what the statute's terms were understood to mean at that time. To paraphrase something Justice Scalia once wrote, "our job is not to scavenge the world of English usage to discover whether there is any possible meaning" of discrimination because of sex that might be broad enough to encompass discrimination because of sexual orientation or gender identity. Chisom v. Roemer , 501 U.S. 380, 410, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (dissenting opinion). Without strong evidence to the contrary (and there is none here), our job is to ascertain and apply the "ordinary meaning" of the statute. Ibid . And in 1964, ordinary Americans most certainly would not have understood Title VII to ban discrimination because of sexual orientation or gender identity.
The Court makes a tiny effort to suggest that at least some people in 1964 might have seen what Title VII really means. Ante , at 1750 - 1751. What evidence does it adduce? One complaint filed in 1969, another filed in 1974, and arguments made in the mid-1970s about the meaning of the Equal Rights Amendment. Ibid . To call this evidence merely feeble would be generous.
C
While Americans in 1964 would have been shocked to learn that Congress had enacted a law prohibiting sexual orientation discrimination, they would have been bewildered to hear that this law also forbids discrimination on the basis of "transgender status" or "gender identity," terms that would have left people at the time scratching their heads. The term "transgender" is said to have been coined " 'in the early 1970s,' "[28] and the term "gender identity," now understood to mean "[a]n internal sense of being male, female or something else,"[29] apparently first appeared in an academic article in 1964.[30] Certainly, neither term was in common parlance; indeed, dictionaries of the time *1773 still primarily defined the word "gender" by reference to grammatical classifications. See, e.g. , American Heritage Dictionary, at 548 (def. 1(a)) ("Any set of two or more categories, such as masculine, feminine, and neuter, into which words are divided ... and that determine agreement with or the selection of modifiers, referents, or grammatical forms").
While it is likely true that there have always been individuals who experience what is now termed "gender dysphoria," i.e. , "[d]iscomfort or distress related to an incongruence between an individual's gender identity and the gender assigned at birth,"[31] the current understanding of the concept postdates the enactment of Title VII. Nothing resembling what is now called gender dysphoria appeared in either DSM-I (1952) or DSM-II (1968). It was not until 1980 that the APA, in DSM-III, recognized two main psychiatric diagnoses related to this condition, "Gender Identity Disorder of Childhood" and "Transsexualism" in adolescents and adults.[32] DSM-III, at 261-266.
The first widely publicized sex reassignment surgeries in the United States were not performed until 1966,[33] and the great majority of physicians surveyed in 1969 thought that an individual who sought sex reassignment surgery was either " 'severely neurotic' " or " 'psychotic.' "[34]
It defies belief to suggest that the public meaning of discrimination because of sex in 1964 encompassed discrimination on the basis of a concept that was essentially unknown to the public at that time.
D
1
The Court's main excuse for entirely ignoring the social context in which Title VII was enacted is that the meaning of Title VII's prohibition of discrimination because of sex is clear, and therefore it simply does not matter whether people in 1964 were "smart enough to realize" what its language means. Hively, 853 F.3d at 357 (Posner, J., concurring). According to the Court, an argument that looks to the societal norms of those times represents an impermissible attempt to displace the statutory language. Ante , at 1750 - 1751.
The Court's argument rests on a false premise. As already explained at length, the text of Title VII does not prohibit discrimination because of sexual orientation or gender identity. And what the public thought about those issues in 1964 is relevant and important, not because it provides a ground for departing from the statutory text, but because it helps to explain what the text was understood to mean when adopted.
In arguing that we must put out of our minds what we know about the time when Title VII was enacted, the Court relies on Justice Scalia's opinion for the Court in Oncale v. Sundowner Offshore Services, Inc. , 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). But Oncale is nothing like these cases, and no one should be taken in by the majority's effort to enlist Justice Scalia in its updating project.
*1774 The Court's unanimous decision in Oncale was thoroughly unremarkable. The Court held that a male employee who alleged that he had been sexually harassed at work by other men stated a claim under Title VII. Although the impetus for Title VII's prohibition of sex discrimination was to protect women, anybody reading its terms would immediately appreciate that it applies equally to both sexes, and by the time Oncale reached the Court, our precedent already established that sexual harassment may constitute sex discrimination within the meaning of Title VII. See Meritor Savings Bank, FSB v. Vinson , 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Given these premises, syllogistic reasoning dictated the holding.
What today's decision latches onto are Oncale 's comments about whether " 'male-on-male sexual harassment' " was on Congress's mind when it enacted Title VII. Ante , at 1751 (quoting 523 U.S. at 79, 118 S.Ct. 998 ). The Court in Oncale observed that this specific type of behavior "was assuredly not the principal evil Congress was concerned with when it enacted Title VII," but it found that immaterial because "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." 523 U.S. at 79, 118 S.Ct. 998 (emphasis added).
It takes considerable audacity to read these comments as committing the Court to a position on deep philosophical questions about the meaning of language and their implications for the interpretation of legal rules. These comments are better understood as stating mundane and uncontroversial truths. Who would argue that a statute applies only to the "principal evils" and not lesser evils that fall within the plain scope of its terms? Would even the most ardent "purposivists" and fans of legislative history contend that congressional intent is restricted to Congress's "principal concerns"?
Properly understood, Oncale does not provide the slightest support for what the Court has done today. For one thing, it would be a wild understatement to say that discrimination because of sexual orientation and transgender status was not the "principal evil" on Congress's mind in 1964. Whether we like to admit it now or not, in the thinking of Congress and the public at that time, such discrimination would not have been evil at all.
But the more important difference between these cases and Oncale is that here the interpretation that the Court adopts does not fall within the ordinary meaning of the statutory text as it would have been understood in 1964. To decide for the defendants in Oncale , it would have been necessary to carve out an exception to the statutory text. Here, no such surgery is at issue. Even if we totally disregard the societal norms of 1964, the text of Title VII does not support the Court's holding. And the reasoning of Oncale does not preclude or counsel against our taking those norms into account. They are relevant, not for the purpose of creating an exception to the terms of the statute, but for the purpose of better appreciating how those terms would have been understood at the time.
2
The Court argues that two other decisions-- Phillips v. Martin Marietta Corp. , 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam ), and Los Angeles Dept. of Water and Power v. Manhart , 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) --buttress its decision, but those cases merely held that Title VII prohibits employer conduct that plainly constitutes discrimination *1775 because of biological sex. In Philips , the employer treated women with young children less favorably than men with young children. In Manhart , the employer required women to make larger pension contributions than men. It is hard to see how these holdings assist the Court.
The Court extracts three "lessons" from Phillips , Manhart , and Oncale , but none sheds any light on the question before us. The first lesson is that "it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it." Ante , at 1744. This lesson is obviously true but proves nothing. As to the label attached to a practice, has anyone ever thought that the application of a law to a person's conduct depends on how it is labeled? Could a bank robber escape conviction by saying he was engaged in asset enhancement? So if an employer discriminates because of sex, the employer is liable no matter what it calls its conduct, but if the employer's conduct is not sex discrimination, the statute does not apply. Thus, this lesson simply takes us back to the question whether discrimination because of sexual orientation or gender identity is a form of discrimination because of biological sex. For reasons already discussed, see Part I-A, supra , it is not.
It likewise proves nothing of relevance here to note that an employer cannot escape liability by showing that discrimination on a prohibited ground was not its sole motivation. So long as a prohibited ground was a motivating factor, the existence of other motivating factors does not defeat liability.
The Court makes much of the argument that "[i]n Phillips , the employer could have accurately spoken of its policy as one based on 'motherhood.' " Ante , at 1744; see also ante, at 1745. But motherhood, by definition, is a condition that can be experienced only by women, so a policy that distinguishes between motherhood and parenthood is necessarily a policy that draws a sex-based distinction. There was sex discrimination in Phillips , because women with children were treated disadvantageously compared to men with children.
Lesson number two-"the plaintiff 's sex need not be the sole or primary cause of the employer's adverse action," ante , at 1744-is similarly unhelpful. The standard of causation in these cases is whether sex is necessarily a "motivating factor" when an employer discriminates on the basis of sexual orientation or gender identity. 42 U.S.C. § 2000e-2(m). But the essential question-whether discrimination because of sexual orientation or gender identity constitutes sex discrimination-would be the same no matter what causation standard applied. The Court's extensive discussion of causation standards is so much smoke.
Lesson number three--"an employer cannot escape liability by demonstrating that it treats males and females comparably as groups," ante , at 1744, is also irrelevant. There is no dispute that discrimination against an individual employee based on that person's sex cannot be justified on the ground that the employer's treatment of the average employee of that sex is at least as favorable as its treatment of the average employee of the opposite sex. Nor does it matter if an employer discriminates against only a subset of men or women, where the same subset of the opposite sex is treated differently, as in Phillips . That is not the issue here. An employer who discriminates equally on the basis of sexual orientation or gender identity applies the same criterion to every affected individual regardless of sex. See Part I-A, supra .
*1776 III
A
Because the opinion of the Court flies a textualist flag, I have taken pains to show that it cannot be defended on textualist grounds. But even if the Court's textualist argument were stronger, that would not explain today's decision. Many Justices of this Court, both past and present, have not espoused or practiced a method of statutory interpretation that is limited to the analysis of statutory text. Instead, when there is ambiguity in the terms of a statute, they have found it appropriate to look to other evidence of "congressional intent," including legislative history.
So, why in these cases are congressional intent and the legislative history of Title VII totally ignored? Any assessment of congressional intent or legislative history seriously undermines the Court's interpretation.
B
As the Court explained in General Elec. Co. v. Gilbert , 429 U.S. 125, 143, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the legislative history of Title VII's prohibition of sex discrimination is brief, but it is nevertheless revealing. The prohibition of sex discrimination was "added to Title VII at the last minute on the floor of the House of Representatives," Meritor Savings Bank , 477 U.S. at 63, 106 S.Ct. 2399, by Representative Howard Smith, the Chairman of the Rules Committee. See 110 Cong. Rec. 2577 (1964). Representative Smith had been an ardent opponent of the civil rights bill, and it has been suggested that he added the prohibition against discrimination on the basis of "sex" as a poison pill. See, e.g. , Ulane v. Eastern Airlines, Inc. , 742 F.2d 1081, 1085 (CA7 1984). On this theory, Representative Smith thought that prohibiting employment discrimination against women would be unacceptable to Members who might have otherwise voted in favor of the bill and that the addition of this prohibition might bring about the bill's defeat.[35] But if Representative Smith had been looking for a poison pill, prohibiting discrimination on the basis of sexual orientation or gender identity would have been far more potent. However, neither Representative Smith nor any other Member said one word about the possibility that the prohibition of sex discrimination might have that meaning. Instead, all the debate concerned discrimination on the basis of biological sex.[36] See 110 Cong. Rec. 2577-2584.
Representative Smith's motivations are contested, 883 F.3d at 139-140 (Lynch, J., dissenting), but whatever they were, the meaning of the adoption of the prohibition of sex discrimination is clear. It was no accident. It grew out of "a long history of women's rights advocacy that had increasingly been gaining mainstream recognition and acceptance," and it marked a landmark achievement in the path toward fully *1777 equal rights for women. Id. , at 140. "Discrimination against gay women and men, by contrast, was not on the table for public debate ... [i]n those dark, pre-Stonewall days." Ibid .
For those who regard congressional intent as the touchstone of statutory interpretation, the message of Title VII's legislative history cannot be missed.
C
Post-enactment events only clarify what was apparent when Title VII was enacted. As noted, bills to add "sexual orientation" to Title VII's list of prohibited grounds were introduced in every Congress beginning in 1975, see supra , at 1754 - 1755, and two such bills were before Congress in 1991[37] when it made major changes in Title VII. At that time, the three Courts of Appeals to reach the issue had held that Title VII does not prohibit discrimination because of sexual orientation,[38] two other Circuits had endorsed that interpretation in dicta,[39] and no Court of Appeals had held otherwise. Similarly, the three Circuits to address the application of Title VII to transgender persons had all rejected the argument that it covered discrimination on this basis.[40] These were also the positions of the EEOC.[41] In enacting substantial changes to Title VII, the 1991 Congress abrogated numerous judicial decisions with which it disagreed. If it also disagreed with the decisions regarding sexual orientation and transgender discrimination, it could have easily overruled those as well, but it did not do so.[42]
After 1991, six other Courts of Appeals reached the issue of sexual orientation discrimination, and until 2017, every single Court of Appeals decision understood Title VII's prohibition of "discrimination because of sex" to mean discrimination because of biological sex. See, e.g. , Higgins v. New Balance Athletic Shoe, Inc. , 194 F.3d 252, 259 (CA1 1999) ; Simonton v. Runyon , 232 F.3d 33, 36 (CA2 2000) ; Bibby v. Philadelphia Coca Cola Bottling Co. , 260 F.3d 257, 261 (CA3 2001), cert. denied, 534 U.S. 1155, 122 S.Ct. 1126, 151 L.Ed.2d 1018 (2002) ; Wrightson v. Pizza Hut of Am., Inc. , 99 F.3d 138, 143 (CA4 1996) ; Hamm v. Weyauwega Milk Products, Inc. , 332 F.3d 1058, 1062 (CA7 2003) ; Medina v. Income Support Div., N. M. , 413 F.3d 1131, 1135 (CA10 2005) ; Evans v. Georgia Regional Hospital , 850 F.3d 1248, 1255 (CA11), cert. denied, 583 U.S. ----, 138 S.Ct. 557, 199 L.Ed.2d 446 (2017). Similarly, the other Circuit to formally address *1778 whether Title VII applies to claims of discrimination based on transgender status had also rejected the argument, creating unanimous consensus prior to the Sixth Circuit's decision below. See Etsitty v. Utah Transit Authority , 502 F.3d 1215, 1220-1221 (CA10 2007).
The Court observes that "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms," ante , at 1749, but it has no qualms about disregarding over 50 years of uniform judicial interpretation of Title VII's plain text. Rather, the Court makes the jaw-dropping statement that its decision exemplifies "judicial humility." Ante , at 1753. Is it humble to maintain, not only that Congress did not understand the terms it enacted in 1964, but that all the Circuit Judges on all the pre-2017 cases could not see what the phrase discrimination "because of sex" really means? If today's decision is humble, it is sobering to imagine what the Court might do if it decided to be bold.
IV
What the Court has done today--interpreting discrimination because of "sex" to encompass discrimination because of sexual orientation or gender identity--is virtually certain to have far-reaching consequences. Over 100 federal statutes prohibit discrimination because of sex. See Appendix C, infra ; e.g. , 20 U.S.C. § 1681(a) (Title IX); 42 U.S.C. § 3631 (Fair Housing Act); 15 U.S.C. 1691(a)(1) (Equal Credit Opportunity Act). The briefs in these cases have called to our attention the potential effects that the Court's reasoning may have under some of these laws, but the Court waves those considerations aside. As to Title VII itself, the Court dismisses questions about "bathrooms, locker rooms, or anything else of the kind." Ante , at 1753. And it declines to say anything about other statutes whose terms mirror Title VII's.
The Court's brusque refusal to consider the consequences of its reasoning is irresponsible. If the Court had allowed the legislative process to take its course, Congress would have had the opportunity to consider competing interests and might have found a way of accommodating at least some of them. In addition, Congress might have crafted special rules for some of the relevant statutes. But by intervening and proclaiming categorically that employment discrimination based on sexual orientation or gender identity is simply a form of discrimination because of sex, the Court has greatly impeded-and perhaps effectively ended-any chance of a bargained legislative resolution. Before issuing today's radical decision, the Court should have given some thought to where its decision would lead.
As the briefing in these cases has warned, the position that the Court now adopts will threaten freedom of religion, freedom of speech, and personal privacy and safety. No one should think that the Court's decision represents an unalloyed victory for individual liberty.
I will briefly note some of the potential consequences of the Court's decision, but I do not claim to provide a comprehensive survey or to suggest how any of these issues should necessarily play out under the Court's reasoning.[43]
"[B]athrooms, locker rooms, [and other things] of [that] kind." The Court may wish to avoid this subject, but it is a matter of concern to many people who are reticent about disrobing or using toilet facilities *1779 in the presence of individuals whom they regard as members of the opposite sex. For some, this may simply be a question of modesty, but for others, there is more at stake. For women who have been victimized by sexual assault or abuse, the experience of seeing an unclothed person with the anatomy of a male in a confined and sensitive location such as a bathroom or locker room can cause serious psychological harm.[44]
Under the Court's decision, however, transgender persons will be able to argue that they are entitled to use a bathroom or locker room that is reserved for persons of the sex with which they identify, and while the Court does not define what it means by a transgender person, the term may apply to individuals who are "gender fluid," that is, individuals whose gender identity is mixed or changes over time.[45] Thus, a person who has not undertaken any physical transitioning may claim the right to use the bathroom or locker room assigned to the sex with which the individual identifies at that particular time. The Court provides no clue why a transgender person's claim to such bathroom or locker room access might not succeed.
A similar issue has arisen under Title IX, which prohibits sex discrimination by any elementary or secondary school and any college or university that receives federal financial assistance.[46] In 2016, a Department of Justice advisory warned that barring a student from a bathroom assigned to individuals of the gender with which the student identifies constitutes unlawful sex discrimination,[47] and some lower court decisions have agreed. See Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Ed. , 858 F.3d 1034, 1049 (CA7 2017) ; G. G. v. Gloucester Cty. School Bd. , 822 F.3d 709, 715 (CA4 2016), vacated and remanded, 580 U.S. ----, 137 S.Ct. 1239, 197 L.Ed.2d 460 (2017) ; Adams v. School Bd. of St. Johns Cty. , 318 F.Supp.3d 1293, 1325 (MD Fla. 2018) ; cf. Doe v. Boyertown Area
School Dist. , 897 F.3d 518, 533 (CA3 2018), cert. denied, 587 U.S. ----, 139 S.Ct. 2636, 204 L.Ed.2d 300 (2019).
Women's sports . Another issue that may come up under both Title VII and Title IX is the right of a transgender individual to participate on a sports team or in an athletic competition previously reserved for members of one biological sex.[48] This issue has already arisen under Title IX, where it threatens to undermine one of that law's major achievements, giving young women an equal opportunity to participate in sports. The effect of the Court's reasoning may be to force young women to compete against students who have a very significant biological advantage, including students who have the size and strength of a *1780 male but identify as female and students who are taking male hormones in order to transition from female to male. See, e.g. , Complaint in Soule v. Connecticut Assn. of Schools , No. 3:20-cv-00201 (D Conn., Apr. 17, 2020) (challenging Connecticut policy allowing transgender students to compete in girls' high school sports); Complaint in Hecox v. Little , No. 1:20-cv-00184 (D Idaho, Apr. 15, 2020) (challenging state law that bars transgender students from participating in school sports in accordance with gender identity). Students in these latter categories have found success in athletic competitions reserved for females.[49]
The logic of the Court's decision could even affect professional sports. Under the Court's holding that Title VII prohibits employment discrimination because of transgender status, an athlete who has the physique of a man but identifies as a woman could claim the right to play on a women's professional sports team. The owners of the team might try to claim that biological sex is a bona fide occupational qualification (BFOQ) under 42 U.S.C. § 2000e-2(e), but the BFOQ exception has been read very narrowly. See Dothard v. Rawlinson , 433 U.S. 321, 334, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).
Housing . The Court's decision may lead to Title IX cases against any college that resists assigning students of the opposite biological sex as roommates. A provision of Title IX, 20 U.S.C. § 1686, allows schools to maintain "separate living facilities for the different sexes," but it may be argued that a student's "sex" is the gender with which the student identifies.[50] Similar claims may be brought under the Fair Housing Act. See 42 U.S.C. § 3604.
Employment by religious organizations . Briefs filed by a wide range of religious groups--Christian, Jewish, and Muslim--express deep concern that the position now adopted by the Court "will trigger open conflict with faithbased employment practices of numerous churches, synagogues, mosques, and other religious institutions."[51] They argue that "[r]eligious organizations need employees who actually live the faith,"[52] and that compelling a religious organization to employ individuals whose conduct flouts the tenets of the organization's faith forces the group to communicate an objectionable message.
*1781 This problem is perhaps most acute when it comes to the employment of teachers. A school's standards for its faculty "communicate a particular way of life to its students," and a "violation by the faculty of those precepts" may undermine the school's "moral teaching."[53] Thus, if a religious school teaches that sex outside marriage and sex reassignment procedures are immoral, the message may be lost if the school employs a teacher who is in a same-sex relationship or has undergone or is undergoing sex reassignment. Yet today's decision may lead to Title VII claims by such teachers and applicants for employment.
At least some teachers and applicants for teaching positions may be blocked from recovering on such claims by the "ministerial exception" recognized in Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC , 565 U.S. 171, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012). Two cases now pending before the Court present the question whether teachers who provide religious instruction can be considered to be "ministers."[54] But even if teachers with those responsibilities qualify, what about other very visible school employees who may not qualify for the ministerial exception? Provisions of Title VII provide exemptions for certain religious organizations and schools "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on" of the "activities" of the organization or school, 42 U.S.C. § 2000e-1(a) ; see also § 2000e-2(e)(2), but the scope of these provisions is disputed, and as interpreted by some lower courts, they provide only narrow protection.[55]
Healthcare . Healthcare benefits may emerge as an intense battleground under the Court's holding. Transgender employees have brought suit under Title VII to challenge employer-provided health insurance plans that do not cover costly sex reassignment surgery.[56] Similar claims have been brought under the Affordable Care Act (ACA), which broadly prohibits sex discrimination in the provision of healthcare.[57]
*1782 Such claims present difficult religious liberty issues because some employers and healthcare providers have strong religious objections to sex reassignment procedures, and therefore requiring them to pay for or to perform these procedures will have a severe impact on their ability to honor their deeply held religious beliefs.
Freedom of speech . The Court's decision may even affect the way employers address their employees and the way teachers and school officials address students. Under established English usage, two sets of sex-specific singular personal pronouns are used to refer to someone in the third person (he, him, and his for males; she, her, and hers for females). But several different sets of gender-neutral pronouns have now been created and are preferred by some individuals who do not identify as falling into either of the two traditional categories.[58] Some jurisdictions, such as New York City, have ordinances making the failure to use an individual's preferred pronoun a punishable offense,[59] and some colleges have similar rules.[60] After today's decision, plaintiffs may claim that the failure to use their preferred pronoun violates one of the federal laws prohibiting sex discrimination. See Prescott v. Rady Children's Hospital San Diego , 265 F.Supp.3d 1090, 1098-1100 (SD Cal. 2017) (hospital staff 's refusal to use preferred pronoun *1783 violates ACA).[61]
The Court's decision may also pressure employers to suppress any statements by employees expressing disapproval of same-sex relationships and sex reassignment procedures. Employers are already imposing such restrictions voluntarily, and after today's decisions employers will fear that allowing employees to express their religious views on these subjects may give rise to Title VII harassment claims.
Constitutional claims . Finally, despite the important differences between the Fourteenth Amendment and Title VII, the Court's decision may exert a gravitational pull in constitutional cases. Under our precedents, the Equal Protection Clause prohibits sex-based discrimination unless a "heightened" standard of review is met. Sessions v. Morales-Santana , 582 U.S. ----, ----, 137 S.Ct. 1678, 1689, 198 L.Ed.2d 150 (2017); United States v. Virginia , 518 U.S. 515, 532-534, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). By equating discrimination because of sexual orientation or gender identity with discrimination because of sex, the Court's decision will be cited as a ground for subjecting all three forms of discrimination to the same exacting standard of review.
Under this logic, today's decision may have effects that extend well beyond the domain of federal antidiscrimination statutes. This potential is illustrated by pending and recent lower court cases in which transgender individuals have challenged a variety of federal, state, and local laws and policies on constitutional grounds. See, e.g. , Complaint in Hecox , No. 1: 20-CV-00184 (state law prohibiting transgender students from competing in school sports in accordance with their gender identity); Second Amended Complaint in Karnoski v. Trump , No. 2:17-cv-01297 (WD Wash., July 31, 2019) (military's ban on transgender members); Kadel v. Folwell , ---- F. Supp. 3d ----, ---- - ----, 2020 WL 1169271, *10-*11 (MDNC, Mar. 11, 2020) (state health plan's exclusion of coverage for sex reassignment procedures); Complaint in Gore v. Lee , No. 3:19-cv-00328 (MD Tenn., Mar. 3, 2020) (change of gender on birth certificates); Brief for Appellee in Grimm v. Gloucester Cty. School Bd. , No. 19-1952 (CA4, Nov. 18, 2019) (transgender student forced to use gender neutral bathrooms at school); Complaint in Corbitt v. Taylor , No. 2:18-cv-00091 (MD Ala., July 25, 2018) (change of gender on driver's licenses); Whitaker , 858 F.3d at 1054 (school policy requiring students to use the bathroom that corresponds to the sex on birth certificate); Keohane v. Florida Dept. of Corrections Secretary , 952 F.3d 1257, 1262-1265 (CA11 2020) (transgender prisoner denied hormone therapy and ability to dress and groom as a female); Edmo v. Corizon, Inc. , 935 F.3d 757, 767 (CA9 2019) (transgender prisoner requested sex reassignment surgery); cf. Glenn v. Brumby , 663 F.3d 1312, 1320 (CA11 2011) (transgender individual fired for gender non-conformity).
Although the Court does not want to think about the consequences of its decision, we will not be able to avoid those issues for long. The entire Federal Judiciary will be mired for years in disputes about the reach of the Court's reasoning.
* * *
The updating desire to which the Court succumbs no doubt arises from humane and generous impulses. Today, many *1784 Americans know individuals who are gay, lesbian, or transgender and want them to be treated with the dignity, consideration, and fairness that everyone deserves. But the authority of this Court is limited to saying what the law is .
The Court itself recognizes this:
"The place to make new legislation ... lies in Congress. When it comes to statutory interpretation, our role is limited to applying the law's demands as faithfully as we can in the cases that come before us." Ante , at 1753.
It is easy to utter such words. If only the Court would live by them.
I respectfully dissent.
APPENDIXES
A
Webster's New International Dictionary 2296 (2d ed. 1953):
sex (seks), n. [F. sexe , fr. L. sexus; prob. orig., division, and akin to L. secare to cut. See SECTION .] 1. One of the two divisions of organisms formed on the distinction of male and female; males or females collectively. 2. The sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female, or of pertaining to the distinctive function of the male or female in reproduction. Conjugation, or fertilization (union of germplasm of two individuals), a process evidently of great but not readily explainable importance in the perpetuation of most organisms, seems to be the function of differentiation of sex, which occurs in nearly all organisms at least at some stage in their life history. Sex is manifested in the conjugating cells by the larger size, abundant food material, and immobility of the female gamete (egg , egg cell , or ovum ), and the small size and the locomotive power of the male gamete (spermatozoon or spermatozoid ), and in the adult organisms often by many structural, physiological, and (in higher forms) psychological characters, aside from the necessary modification of the reproductive apparatus. Cf. HERMAPHRODITE , 1. In botany the term sex is often extended to the distinguishing peculiarities of staminate and pistillate flowers, and hence in dioecious plants to the individuals bearing them.
In many animals and plants the body and germ cells have been shown to contain one or more chromosomes of a special kind (called sex chromosomes; idiochromosomes; accessory chromosomes ) in addition to the ordinary paired autosomes. These special chromosomes serve to determine sex. In the simplest case, the male germ cells are of two types, one with and one without a single extra chromosome (X chromosome , or monosome ). The egg cells in this case all possess an X chromosome , and on fertilization by the two types of sperm, male and female zygotes result, of respective constitution X , and XX . In many other animals and plants (probably including man) the male organism produces two types of gametes, one possessing an X chromosome , the other a Y chromosome , these being visibly different members of a pair of chromosomes present in the diploid state. In this case also, the female organism is XX , the eggs X , and the zygotes respectively male (XY ) and female (XX ). In another type of sex determination, as in certain moths and possibly in the fowl, the female produces two kinds of eggs, the male only one kind of sperm. Each type of egg contains one member of a pair of differentiated chromosomes, *1785 called respectively Z chromosomes and W chromosomes , while all the sperm cells contain a Z chromosome. In fertilization, union of a Z with a W gives rise to a female, while union of two Z chromosomes produces a male. Cf. SECONDARY SEX CHARACTER .
3. a The sphere of behavior dominated by the relations between male and female. b Psychoanalysis . By extension, the whole sphere of behavior related even indirectly to the sexual functions and embracing all affectionate and pleasure-seeking conduct.
4. Phenomena of sexual instincts and their manifestations.
5. Sect;-a confused use.
Syn. - SEX, GENDER. SEX refers to physiological distinctions; GENDER , to distinctions in grammar.
-the sex . The female sex; women, in general.
sex, adj . Based on or appealing to sex.
sex, v. t. To determine the sex of, as skeletal remains.
Webster's Third New International Dictionary 2081 (1966):
[1]sex \'seks\ n -ES often attrib [ME, fr. L sexus; prob. akin to L secare to cut-more at SAW ] 1: one of the two divisions of organic esp. human beings respectively designated male or female < a member of the opposite ~>2: the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typical dichotomous occurrence is usu. genetically controlled and associated with special sex chromosomes, and that is typically manifested as maleness and femaleness with one or the other of these being present in most higher animals though both may occur in the same individual in many plants and some invertebrates and though no such distinction can be made in many lower forms (as some fungi, protozoans, and possibly bacteria and viruses) either because males and females are replaced by mating types or because the participants in sexual reproduction are indistinguishable-compare HETEROTHALLIC, HOMOTHALLIC; FERTILIZATION, MEIOSIS, MENDEL'S LAW; FREEMARTIN, HERMAPHRODITE, INTERSEX 3: the sphere of interpersonal behavior esp. between male and female most directly associated with, leading up to, substituting for, or resulting from genital union < agree that the Christian's attitude toward ~ should not be considered apart from love, marriage, family-M. M. Forney>4: the phenomena of sexual instincts and their manifestations < with his customary combination of philosophy, insight, good will toward the world, and entertaining interest in ~-Allen Drury> < studying and assembling what modern scientists have discovered about ~-Time>; specif : SEXUAL INTERCOURSE < an old law imposing death for ~ outside marriage-William Empson>
[2]sex \''\ vt -ED/-ING/-ES 1: to determine the sex of (an organic being) < it is difficult to ~ the animals at a distance-E. A. Hooton>-compare AUTOSEXING 2 a: to increase the sexual appeal or attraction of-usu. used with up < titles must be ~ed up to attract 56 million customers-Time> b: to arouse the sexual instincts or desires of-usu. used with up < watching you ~ing up that bar kitten-Oakley Hall>
*1786 9 Oxford English Dictionary 577-578 (1933):
Sex (seks), sb . Also 6-7 sexe, (6 seex, 7 pl. sexe, 8 poss . sexe's). [ad. L. sexus (u -stem), whence also F. sexe (12th c.), Sp., Pg. sexo , It. sesso . Latin had also a form secus neut. (indeclinable).]
1. Either of the two divisions of organic beings distinguished as male and female respectively; the males or the females (of a species, etc., esp. of the human race) viewed collectively.
1382 WYCLIF Gen . vi. 19 Of alle thingis hauynge sowle of ony flehs, two thow shalt brynge into the ark, that maal sex and femaal lyuen with thee. 1532 MORE Confut. Tindale II. 152, I had as leue he bare them both a bare cheryte, as wyth the frayle feminyne sexe fall to far in loue. 1559 ALYMER Harborowe E 4 b, Neither of them debarred the heires female .. as though it had ben .. vnnatural for that sexe to gouern. 1576 GASCOIGNE Philomene xcviii, I speake against my sex. a 1586 SIDNEY Arcadia II. (1912) 158 The sexe of womankind of all other is most bound to have regardfull eie to mens judgements. 1600 NASHE Summer's Last Will F 3 b, A woman they imagine her to be, Because that sexe keepes nothing close they heare. 1615 CROOKE Body of Man 274 If wee respect the .. conformation of both the Sexes, the Male is sooner perfected .. in the wombe. 1634 SIR T. HERBERT Trav. 19 Both sexe goe naked. 1667 MILTON P. L. IX, 822 To add what wants In Femal Sex. 1671-Samson 774 It was a weakness In me, but incident to all our sex. 1679 DRYDEN Troilus & Cr. I. ii, A strange dissembling sex we women are. 1711 ADDISON Spect. No. 10 ¶ 6 Their Amusements .. are more adapted to the Sex than to the Species. 1730 SWIFT Let. to Mrs. Whiteway 28 Dec., You have neither the scrawl nor the spelling of your sex. 1742 GRAY Propertius II. 73 She .. Condemns her fickle Sexe's fond Mistake. 1763 G. WILLIAMS in Jesse Selwyn & Contemp. (1843) I. 265 It would astonish you to see the mixture of sexes at this place. 1780 BENTHAM Princ. Legisl. VI. § 35 The sensibility of the female sex appears .. to be greater than that of the male. 1814 SCOTT Ld. of Isles VI. iii, Her sex's dress regain'd. 1836 THIRLWALL Greece xi. II. 51 Solon also made regulations for the government of the other sex. 1846 Ecclesiologist Feb. 41 The propriety and necessity of dividing the sexes during the publick offices of the Church. 1848 THACKERAY Van. Fair xxv, She was by no means so far superior to her sex as to be above jealousy. 1865 DICKENS Mut. Fr. II. i, It was a school for both sexes. 1886 MABEL COLLINS Prettiest Woman ii, Zadwiga had not yet given any serious attention to the other sex.
b. collect. followed by plural verb. rare.
1768 GOLDSM . Good. n. Man IV. (Globe) 632/2 Our sex are like poor tradesmen. 1839 MALCOM Trav. (1840) 40/I Neither sex tattoo any part of their bodies.
c. The fair(er), gentle(r), soft(er), weak(er) sex; the devout sex ; the second sex ; † the woman sex : the female sex, women. The † better, sterner sex : the male sex, men.
[1583 STUBBES Anat. Abus. E vij b, Ye magnificency & liberalitie of that gentle sex. 1613 PURCHAS Pilgrimage (1614) 38 Strong Sampson and wise Solomon are witnesses, that the strong men are slaine by this weaker sexe.]
1641 BROME Jovial Crew III. (1652) H 4, I am bound by a strong vow to kisse all of the woman sex I meet this morning. 1648 J. BEAUMONT Psyche XIV. I, *1787 The softer sex, attending Him And his still-growing woes. 1665 SIR T. HERBERT Trav. (1677) 22 Whiles the better sex seek prey abroad, the women (therein like themselves) keep home and spin. 1665 BOYLE Occas. Refl. v. ix. 176 Persons of the fairer Sex. a 1700 EVELYN Diary 12 Nov. an. 1644, The Pillar .. at which the devout sex are always rubbing their chaplets. 1701 STANHOPE St. Aug. Medit. I. xxxv. (1704) 82, I may .. not suffer my self to be outdone by the weaker Sex. 1732 [see FAIR a. I b]. 1753 HOGARTH Anal. Beauty x. 65 An elegant degree of plumpness peculiar to the skin of the softer sex. 1820 BYRON Juan IV. cviii, Benign Ceruleans of the second sex! Who advertise new poems by your looks. 1838 Murray's Hand-bk. N. Germ. 430 It is much frequented by the fair sex. 1894 C. D. TYLER in Geog. Jrnl. III. 479 They are beardless, and usually wear a shock of unkempt hair, which is somewhat finer in the gentler sex.
¶d. Used occas. with extended notion. The third sex : eunuchs. Also sarcastically (see quot. 1873).
1820 BYRON Juan IV. lxxxvi, From all the Pope makes yearly, 'twould perplex To find three perfect pipes of the third sex. Ibid . V. xxvi, A black old neutral personage Of the third sex stept up. [1873 LD. HOUGHTON Monogr. 280 Sydney Smith .. often spoke with much bitterness of the growing belief in three Sexes of Humanity-Men, Women, and Clergymen.]
e. The sex : the female sex. [F. le sexe .] Now rare.
1589 PUTTENHAM Eng. Poesie III. xix. (Arb.) 235 As he that had tolde a long tale before certaine noble women, of a matter somewhat in honour touching the Sex. 1608 D. T[ UVILL ] Ess. Pol. & Mor. 101 b, Not yet weighing with himselfe, the weaknesse and imbecillitie of the sex. 1631 MASSINGER Emperor East I. ii, I am called The Squire of Dames, or Servant of the Sex. 1697 VANBRUGH Prov. Wife II. ii, He has a strange penchant to grow fond of me, in spite of his aversion to the sex. 1760-2 GOLDSM . Cit. W. xcix, The men of Asia behave with more deference to the sex than you seem to imagine. 1792 A. YOUNG Trav. France I. 220 The sex of Venice are undoubtedly of a distinguished beauty. 1823 BYRON Juan XIII. lxxix, We give the sex the pas . 1863 R. F. BURTON W. Africa I. 22 Going 'up stairs', as the sex says, at 5 a.m. on the day after arrival, I cast the first glance at Funchal.
f. Without the , in predicative quasi-adj. use=feminine. rare.
a 1700 DRYDEN Cymon & Iph. 368 She hugg'd th' Offender, and forgave th' Offence, Sex to the last!
2. Quality in respect of being male or female.
a. With regard to persons or animals.
1526 Pilgr. Perf. (W. de. W. 1531) 282 b, Ye bee, whiche neuer gendreth with ony make of his kynde, nor yet hath ony distinct sex. 1577 T. KENDALL Flowers of Epigr. 71 b, If by corps supposd may be her seex, then sure a virgin she. 1616 T. SCOTT Philomythie I. (ed. 2) A 3 Euen as Hares change shape and sex, some say Once euery yeare. 1658 SIR T. BROWNE Hydriot . iii. 18 A critical view of bones makes a good distinction of sexes. a 1665 DIGBY Chym. Secrets (1682) II. 225 Persons of all Ages and Sexes. 1667 MILTON P. L. I. 424 For Spirits when they please can either Sex assume, or both. 1710-11 SWIFT Jrnl. to Stella 7 Mar., I find I was mistaken in the sex, 'tis a boy. 1757 SMOLLETT Reprisal IV. v, As for me, my sex protects me. 1825 SCOTT Betrothed xiii, I am but a poor and neglected woman, *1788 feeble both from sex and age. 1841 ELPHINSTONE Hist. India I. 349 When persons of different sexes walk together, the woman always follows the man. 1882 TENSION-WOODS Fish N. S. Wales 116 Oysters are of distinct sexes.
b. with regard to plants (see FEMALE a . 2, MALE a . 2).
1567 MAPLET Gr. Forest 28 Some seeme to haue both sexes and kindes: as the Oke, the Lawrell and such others. 1631 WIDDOWES Nat. Philos. (ed. 2) 49 There be sexes of hearbes .. namely, the Male or Female. 1720 P. BLAIR Bot. Ess. iv. 237 These being very evident Proofs of a necessity of two Sexes in Plants as well as in Animals. 1790 SMELLIE Philos. Nat. Hist. I. 245 There is not a notion more generally adopted, that that vegetables have the distinction of sexes. 1848 LINDLEY Introd. Bot. (ed. 4) II. 80 Change of Sex under the influence of external causes.
3. The distinction between male and female in general. In recent use often with more explicit notion: The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these; the class of phenomena with which these differences are concerned.
Organs of sex: the reproductive organs in sexed animals or plants.
a 1631 DONNE Songs & Sonn., The Printrose Poems 1912 I. 61 Should she Be more then woman, she would get above All thought of sexe, and think to move My heart to study her, and not to love. a 1643 CARTWRIGHT Siedge III. vi, My Soul's As Male as yours; there's no Sex in the mind. 1748 MELMOTH Fitzosborne Lett. lxii. (1749) II. 119 There may be a kind of sex in the very soul. 1751 HARRIS Hermes Wks. (1841) 129 Besides number, another characteristic, visible in substances, is that of sex. 1878 GLADSTONE Prim. Homer 68 Athenè .. has nothing of sex except the gender, nothing of the woman except the form. 1887 K. PEARSON Eth. Freethought xv. (1888) 429 What is the true type of social (moral) action in matters of sex? 1895 CRACKANTHORPE in 19th Cent. Apr. 607 (art.) Sex in modern literature. Ibid. 614 The writers and readers who have strenuously refused to allow to sex its place in creative art. 1912 H. G. WELLS Marriage ii. § 6. 72 The young need .. to be told .. all we know of three fundamental things; the first of which is God, .. and the third Sex.
¶ 4. Used, by confusion, in senses of SECT (q. v. I, 4 b, 7, and cf. I d note ).
1575-85 ABP. SANDYS Serm. xx. 358 So are all sexes and sorts of people called vpon. 1583 MELBANCKE Philotimus L iij b, Whether thinkest thou better sporte & more absurd, to see an Asse play on an harpe contrary to his sex, or heare [etc.]. 1586 J. HOOKER Hist. Irel. 180/2 in Holinshed , The whole sex of the Oconhours. 1586 T. B. La Primaud. Fr. Acad. I. 359 O detestable furie, not to be found in most cruell beasts, which spare the blood of their sexe. a 1704 T BROWN Dial. Dead, Friendship Wks. 1711 IV. 56 We have had enough of these Christians, and sure there can be no worse among the other Sex of Mankind [i.e. Jews and Turks]? 1707 ATTERBURY Large Vind. Doctr. 47 Much less can I imagine, why a Jewish Sex (whether of Pharisees or Saducees) should be represented, as [etc.].
5. attrib. and Comb., as sex-distinction, function, etc.; sex-abusing, transforming adjs.; sex-cell, a reproductive *1789 cell, with either male or female function; a sperm-cell or an egg-cell.
1642 H. MORE Song of Soul I. III. lxxi, Mad-making waters, sex trans-forming springs. 1781 COWPER Expost. 415 Sin, that in old time Brought fire from heav'n, the sex-abusing crime. 1876 HARDY Ethelberta xxxvii, You cannot have celebrity and sex-privilege both. 1887 Jrnl. Educ. No. 210. 29 If this examination craze is to prevail, and the sex-abolitionists are to have their way. 1889 GEDDES & THOMSON Evol. Sex 91 Very commonly the sex-cells originate in the ectoderm and ripen there. 1894 H. DRUMMOND Ascent of Man 317 The sex-distinction slowly gathers definition. 1897 J. HUTCHINSON in Arch. Surg. VIII. 230 Loss of Sex Function.
Sex (seks), v. [f. SEX sb. ] trans. To determine the sex of, by anatomical examination; to label as male or female.
1884 GURNEY Diurnal Birds Prey 173 The specimen is not sexed, neither is the sex noted on the drawing. 1888 A. NEWTON in Zoologist Ser. 111. XII. 101 The .. barbarous phrase of 'collecting a specimen' and then of 'sexing' it.
Concise Oxford Dictionary of Current English 1164 (5th ed. 1964):
sex, n. Being male or female or hermaphrodite (what is its ~?; ~ does not matter; without distinction of age or ~ ), whence ~'LESS a., ~'le?ss NESS n., ~'Y[2] a., immoderately concerned with ~; males or females collectively (all ranks & both ~es; the fair, gentle, softer, weaker, ~, & joc. the ~, women; the sterner ~, men; is the fairest of her ~ ); (attrib.) arising from difference, or consciousness, of ~ (~ antagonism , ~ instinct , ~ urge ); ~ appeal , attractiveness arising from difference of ~. [f. L sexus -us; partly thr. F]
Random House Dictionary of the English Language 1307 (1966):
sex (seks), n. 1. The fact or character of being either male or female: persons of different sex. 2. either of the two groups of persons exhibiting this character: the stronger sex; the gentle sex. 3. the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences. 4. the instinct or attraction drawing one sex toward another, or its manifestation in life and conduct. 5. coitus. 6. to have sex, Informal . to engage in sexual intercourse. -v.t. 7. to ascertain the sex of, esp. of newly hatched chicks. 8. sex it up, Slang . to neck passionately: They were really sexing it up last night . 9. sex up, Informal. a. to arouse sexually: She certainly knows how to sex up the men. b. to increase the appeal of; to make more interesting, attractive, or exciting: We've decided to sex up the movie with some battle scenes. [ME < L sex (us ), akin to secus , deriv. of secare to cut, divide; see SECTION]
American Heritage Dictionary 1187 (1969):
sex (seks) n. 1. a. The property or quality by which organ-isms are classified according to their reproductive functions. b. Either of two divisions, designated male and female , of this classification. 2. Males or females collectively. 3. The condition or character of being male or female; the physiological, functional, and psychological differences that distinguish the male and the female. 4. The sexual urge or instinct as it manifests itself in behavior. 5. Sexual intercourse. -tr.v. sexed, sexing, sexes. To determine the sex of (young chickens). [Middle English, from Old French sexe , from Latin sexus †.]
*1790 B
Webster's Third New International Dictionary 2081 (2002):
[1]sex \'seks\ n - ES often attrib [ME, fr. L sexus ; prob. akin to L secare to cut-more at SAW ] 1: one of the two divisions of organic esp. human beings respectively designated male or female < a member of the opposite ~>2: the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typical dichotomous occurrence is usu. genetically controlled and associated with special sex chromosomes, and that is typically manifested as maleness and femaleness with one or the other of these being present in most higher animals though both may occur in the same individual in many plants and some invertebrates and though no such distinction can be made in many lower forms (as some fungi, protozoans, and possibly bacteria and viruses) either because males and females are replaced by mating types or because the participants in sexual reproduction are indistinguishable-compare HETEROTHALLIC, HOMOTHALLIC; FERTILIZATION, MEIOSIS, MENDEL'S LAW; FREEMARTIN, HERMAPHRODITE, INTERSEX 3: the sphere of interpersonal behavior esp. between male and female most directly associated with, leading up to, substituting for, or resulting from genital union < agree that the Christian's attitude toward ~ should not be considered apart from love, marriage, family-M. M. Forney>4: the phenomena of sexual instincts and their manifestations < with his customary combination of philosophy, insight, good will toward the world, and entertaining interest in ~-Allen Drury> < studying and assembling what modern scientists have discovered about ~-Time>; specif : SEXUAL INTERCOURSE < an old law imposing death for ~ outside marriage-William Empson>
[2]sex \''\ vt -ED/-ING/-ES 1: to determine the sex of (an organic being) < it is difficult to ~ the animals at a distance-E. A. Hooton>-compare AUTOSEXING 2 a: to increase the sexual appeal or attraction of-usu. used with up < titles must be ~ed up to attract 56 million customers-Time> b: to arouse the sexual instincts or desires of-usu. used with up < watching you ~ing up that bar kitten-Oakley Hall>
Random House Webster's Unabridged Dictionary 1754 (2d ed. 2001):
Sex (seks), n . 1 . either the male or female division of a species, esp. as differentiated with reference to the reproductive functions. 2 . the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences. 3 . the instinct or attraction drawing one sex toward another, or its manifestation in life and conduct. 4 . coitus. 5 . genitalia. 6 . to have sex , to engage in sexual intercourse. - v.t. 7 . to ascertain the sex of, esp. of newly-hatched chicks. 8 . sex up , Informal . a . to arouse sexually: The only intent of that show was to sex up the audience . b . to increase the appeal of; to make more interesting, attractive, or exciting: We've decided to sex up the movie with some battle scenes . [1350-1400; ME < L Sexus , perh. akin to secare to divide (see SECTION ) ]
*1791 American Heritage Dictionary 1605 (5th ed. 2011):
Sex (seks) n . 1a. Sexual activity, especially sexual intercourse: hasn't had sex in months . b . The sexual urge or instinct as it manifests itself in behavior: motivated by sex . 2a . Either of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions: How do you determine the sex of a lobster? b . The fact or condition of existing in these two divisions, especially the collection of characteristics that distinguish female and male: the evolution of sex in plants; a study that takes sex into account. See Usage Note at gender. 3. Females or males considered as a group: dormitories that house only one sex. 4 . One's identity as either female or male. 5 . The genitals. tr.v. sexed, sex-ing, sex-es 1. To determine the sex of (an organism). 2. Slang a. To arouse sexually. Often used with up . b . To increase the appeal or attractiveness of. Often used with up [Middle English < Latin sexus. ]
C
Statutes Prohibiting Sex Discrimination
• 2 U.S.C. § 658a(2) (Congressional Budget and Fiscal Operations; Federal Mandates)
• 2 U.S.C. § 1311(a)(1) (Congressional Accountability; Extension of Rights and Protections)
• 2 U.S.C. § 1503(2) (Unfunded Mandates Reform)
• 3 U.S.C. § 411(a)(1) (Presidential Offices; Employment Discrimination)
• 5 U.S.C. § 2301(b)(2) (Merit System Principles)
• 5 U.S.C. § 2302(b)(1) (Prohibited Personnel Practices)
• 5 U.S.C. § 7103(a)(4)(A) (Labor-Management Relations; Definitions)
• 5 U.S.C. § 7116(b)(4) (Labor-Management Relations; Unfair Labor Practices)
• 5 U.S.C. § 7201(b) (Antidiscrimination Policy; Minority Recruitment Program)
• 5 U.S.C. § 7204(b) (Antidiscrimination; Other Prohibitions)
• 6 U.S.C. § 488f(b) (Secure Handling of Ammonium Nitrate; Protection From Civil Liability)
• 7 U.S.C. § 2020(c)(1) (Supplemental Nutrition Assistance Program)
• 8 U.S.C. § 1152(a)(1)(A) (Immigration; Numerical Limitations on Individual Foreign States)
• 8 U.S.C. § 1187(c)(6) (Visa Waiver Program for Certain Visitors)
• 8 U.S.C. § 1522(a)(5) (Authorization for Programs for Domestic Resettlement of and Assistance to Refugees)
• 10 U.S.C. § 932(b)(4) (Uniform Code of Military Justice; Article 132 Retaliation)
• 10 U.S.C. § 1034(j)(3) (Protected Communications; Prohibition of Retaliatory Personnel Actions)
• 12 U.S.C. § 302 (Directors of Federal Reserve Banks; Number of Members; Classes)
• 12 U.S.C. § 1735f-5(a) (Prohibition Against Discrimination on Account of Sex in Extension of Mortgage Assistance)
• 12 U.S.C. § 1821(d)(13)(E)(iv) (Federal Deposit Insurance Corporation; Insurance Funds)
• 12 U.S.C. § 1823(d)(3)(D)(iv) (Federal Deposit Insurance Corporation; Corporation Moneys)
*1792 • 12 U.S.C. § 2277a-10c(b)(13)(E)(iv) (Farm Credit System Insurance Corporation; Corporation as Conservator or Receiver; Certain Other Powers)
• 12 U.S.C. § 3015(a)(4) (National Consumer Cooperative Bank; Eligibility of Cooperatives)
• 12 U.S.C. §§ 3106a(1)(B) and (2)(B) (Foreign Bank Participation in Domestic Markets)
• 12 U.S.C. § 4545(1) (Fair Housing)
• 12 U.S.C. § 5390(a)(9)(E)(v) (Wall Street Reform and Consumer Protection; Powers and Duties of the Corporation)
• 15 U.S.C. § 631(h) (Aid to Small Business)
• 15 U.S.C. § 633(b)(1) (Small Business Administration)
• 15 U.S.C. § 719 (Alaska Natural Gas Transportation; Civil Rights)
• 15 U.S.C. § 775 (Federal Energy Administration; Sex Discrimination; Enforcement; Other Legal Remedies)
• 15 U.S.C. § 1691(a)(1) (Equal Credit Opportunity Act)
• 15 U.S.C. § 1691d(a) (Equal Credit Opportunity Act)
• 15 U.S.C. § 3151(a) (Full Employment and Balanced Growth; Nondiscrimination)
• 18 U.S.C. § 246 (Deprivation of Relief Benefits)
• 18 U.S.C. § 3593(f) (Special Hearing To Determine Whether a Sentence of Death Is Justified)
• 20 U.S.C. § 1011(a) (Higher Education Resources and Student Assistance; Antidiscrimination)
• 20 U.S.C. § 1011f(h)(5)(D) (Disclosures of Foreign Gifts)
• 20 U.S.C. § 1066c(d) (Historically Black College and University Capital Financing; Limitations on Federal Insurance Bonds Issued by Designated Bonding Authority)
• 20 U.S.C. § 1071(a)(2) (Federal Family Education Loan Program)
• 20 U.S.C. § 1078(c)(2)(F) (Federal Payments To Reduce Student Interest Costs)
• 20 U.S.C. § 1087-1(e) (Federal Family Education Loan Program; Special Allowances)
• 20 U.S.C. § 1087-2(e) (Student Loan Marketing Association)
• 20 U.S.C. § 1087-4 (Discrimination in Secondary Markets Prohibited)
• 20 U.S.C. § 1087tt(c) (Discretion of Student Financial Aid Administrators)
• 20 U.S.C. § 1231e(b)(2) (Education Programs; Use of Funds Withheld)
• 20 U.S.C. § 1681 (Title IX of the Education Amendments of 1972)
• 20 U.S.C. § 1701(a)(1) (Equal Educational Opportunities; Congressional Declaration of Policy)
• 20 U.S.C. § 1702(a)(1) (Equal Educational Opportunities; Congressional Findings)
• 20 U.S.C. § 1703 (Denial of Equal Educational Opportunity Prohibited)
• 20 U.S.C. § 1705 (Assignment on Neighborhood Basis Not a Denial of Equal Educational Opportunity)
• 20 U.S.C. § 1715 (District Lines)
• 20 U.S.C. § 1720 (Equal Educational Opportunities; Definitions)
• 20 U.S.C. § 1756 (Remedies With Respect to School District Lines)
• 20 U.S.C. § 2396 (Career and Technical Education; Federal Laws Guaranteeing Civil Rights)
*1793 • 20 U.S.C. § 3401(2) (Department of Education; Congressional Findings)
• 20 U.S.C. § 7231d(b)(2)(C) (Magnet Schools Assistance; Applications and Requirements)
• 20 U.S.C. § 7914 (Strengthening and Improvement of Elementary and Secondary Schools; Civil Rights)
• 22 U.S.C. § 262p-4n (Foreign Relations and Intercourse; Equal Employment Opportunities)
• 22 U.S.C. § 2304(a)(1) (Human Rights and Security Assistance)
• 22 U.S.C. § 2314(g) (Furnishing of Defense Articles or Related Training or Other Defense Service on Grant Basis)
• 22 U.S.C. § 2426 (Discrimination Against United States Personnel)
• 22 U.S.C. § 2504(a) (Peace Corps Volunteers)
• 22 U.S.C. § 2661a (Foreign Contracts or Arrangements; Discrimination)
• 22 U.S.C. § 2755 (Discrimination Prohibited if Based on Race, Religion, National Origin, or Sex)
• 22 U.S.C. § 3901(b)(2) (Foreign Service; Congressional Findings and Objectives)
• 22 U.S.C. § 3905(b)(1) (Foreign Service; Personnel Actions)
• 22 U.S.C. § 4102(11)(A) (Foreign Service; Definitions)
• 22 U.S.C. § 4115(b)(4) (Foreign Service; Unfair Labor Practices)
• 22 U.S.C. § 6401(a)(3) (International Religious Freedom; Findings; Policy)
• 22 U.S.C. § 8303(c)(2) (Office of Volunteers for Prosperity)
• 23 U.S.C. § 140(a) (Federal-Aid Highways; Nondiscrimination)
• 23 U.S.C. § 324 (Highways; Prohibition of Discrimination on the Basis of Sex)
• 25 U.S.C. § 4223(d)(2) (Housing Assistance for Native Hawaiians)
• 26 U.S.C. § 7471(a)(6)(A) (Tax Court; Employees)
• 28 U.S.C. § 994(d) (Duties of the United States Sentencing Commission)
• 28 U.S.C. § 1862 (Trial by Jury; Discrimination Prohibited)
• 28 U.S.C. § 1867(e) (Trial by Jury; Challenging Compliance With Selection Procedures)
• 29 U.S.C. § 206(d)(1) (Equal Pay Act of 1963)
• 29 U.S.C. §§ 2601(a)(6) and (b)(4) (Family and Medical Leave; Findings and Purposes)
• 29 U.S.C. § 2651(a) (Family and Medical Leave; Effect on Other Laws)
• 29 U.S.C. § 3248 (Workforce Development Opportunities; Nondiscrimination)
• 30 U.S.C. § 1222(c) (Research Funds to Institutes)
• 31 U.S.C. § 732(f) (Government Accountability Office; Personnel Management System)
• 31 U.S.C. § 6711 (Federal Payments; Prohibited Discrimination)
• 31 U.S.C. § 6720(a)(8) (Federal Payments; Definitions, Application, and Administration)
• 34 U.S.C. § 10228(c) (Prohibition of Federal Control Over State and Local Criminal Justice Agencies; Prohibition of Discrimination)
• 34 U.S.C. § 11133(a)(16) (Juvenile Justice and Delinquency Prevention; State Plans)
• 34 U.S.C. § 12161(g) (Community Schools Youth Services and Supervision Grant Program)
*1794 • 34 U.S.C. § 12361 (Violent Crime Control and Law Enforcement; Civil Rights for Women)
• 34 U.S.C. § 20110(e) (Crime Victims Fund; Administration Provisions)
• 34 U.S.C. § 50104(a) (Emergency Federal Law Enforcement Assistance)
• 36 U.S.C. § 20204(b) (Air Force Sergeants Association; Membership)
• 36 U.S.C. § 20205(c) (Air Force Sergeants Association; Governing Body)
• 36 U.S.C. § 21003(a)(4) (American GI Forum of the United States; Purposes)
• 36 U.S.C. § 21004(b) (American GI Forum of the United States; Membership)
• 36 U.S.C. § 21005(c) (American GI Forum of the United States; Governing Body)
• 36 U.S.C. § 21704A (The American Legion)
• 36 U.S.C. § 22703(c) (Amvets; Membership)
• 36 U.S.C. § 22704(d) (Amvets; Governing Body)
• 36 U.S.C. § 60104(b) (82nd Airborne Division Association, Incorporated; Membership)
• 36 U.S.C. § 60105(c) (82nd Airborne Division Association, Incorporated; Governing Body)
• 36 U.S.C. § 70104(b) (Fleet Reserve Association; Membership)
• 36 U.S.C. § 70105(c) (Fleet Reserve Association; Governing Body)
• 36 U.S.C. § 140704(b) (Military Order of the World Wars; Membership)
• 36 U.S.C. § 140705(c) (Military Order of the World Wars; Governing Body)
• 36 U.S.C. § 154704(b) (Non Commissioned Officers Association of the United States of America, Incorporated; Membership)
• 36 U.S.C. § 154705(c) (Non Commissioned Officers Association of the United States of America, Incorporated; Governing Body)
• 36 U.S.C. § 190304(b) (Retired Enlisted Association, Incorporated; Membership)
• 36 U.S.C. § 190305(c) (Retired Enlisted Association, Incorporated; Governing Body)
• 36 U.S.C. § 220522(a)(8) and (9) (United States Olympic Committee; Eligibility Requirements)
• 36 U.S.C. § 230504(b) (Vietnam Veterans of America, Inc.; Membership)
• 36 U.S.C. § 230505(c) (Vietnam Veterans of America, Inc.; Governing Body)
• 40 U.S.C. § 122(a) (Federal Property and Administrative Services; Prohibition on Sex Discrimination)
• 40 U.S.C. § 14702 (Appalachian Regional Development; Nondiscrimination)
• 42 U.S.C. § 213(f) (Military Benefits)
• 42 U.S.C. § 290cc-33(a) (Projects for Assistance in Transition From Homelessness)
• 42 U.S.C. § 290ff-1(e)(2)(C) (Children With Serious Emotional Disturbances; Requirements With Respect to Carrying Out Purpose of Grants)
• 42 U.S.C. § 295m (Public Health Service; Prohibition Against Discrimination on Basis of Sex)
• 42 U.S.C. § 296g (Public Health Service; Prohibition Against Discrimination by Schools on Basis of Sex)
• 42 U.S.C. § 300w-7(a)(2) (Preventive Health and Health Services Block Grants; Nondiscrimination Provisions)
*1795 • 42 U.S.C. § 300x-57(a)(2) (Block Grants Regarding Mental Health and Substance Abuse; Nondiscrimination)
• 42 U.S.C. § 603(a)(5)(I)(iii) (Block Grants to States for Temporary Assistance for Needy Families)
• 42 U.S.C. § 708(a)(2) (Maternal and Child Health Services Block Grant; Nondiscrimination Provisions)
• 42 U.S.C. § 1975a(a) (Duties of Civil Rights Commission)
• 42 U.S.C. § 2000c(b) (Civil Rights; Public Education; Definitions)
• 42 U.S.C. § 2000c-6(a)(2) (Civil Rights; Public Education; Civil Actions by the Attorney General)
• 42 U.S.C. § 2000e-2 (Equal Employment Opportunities; Unlawful Employment Practices)
• 42 U.S.C. § 2000e-3(b) (Equal Employment Opportunities; Other Unlawful Employment Practices)
• 42 U.S.C. § 2000e-16(a) (Employment by Federal Government)
• 42 U.S.C. § 2000e-16a(b) (Government Employee Rights Act of 1991)
• 42 U.S.C. § 2000e-16b(a)(1) (Discriminatory Practices Prohibited)
• 42 U.S.C. § 2000h-2 (Intervention by Attorney General; Denial of Equal Protection on Account of Race, Color, Religion, Sex or National Origin)
• 42 U.S.C. § 3123 (Discrimination on Basis of Sex Prohibited in Federally Assisted Programs)
• 42 U.S.C. § 3604 (Fair Housing Act; Discrimination in the Sale or Rental of Housing and Other Prohibited Practices)
• 42 U.S.C. § 3605 (Fair Housing Act; Discrimination in Residential Real Estate-Related Transactions)
• 42 U.S.C. § 3606 (Fair Housing Act; Discrimination in the Provision of Brokerage Services)
• 42 U.S.C. § 3631 (Fair Housing Act; Violations; Penalties)
• 42 U.S.C. § 4701 (Intergovernmental Personnel Program; Congressional Findings and Declaration of Policy)
• 42 U.S.C. § 5057(a)(1) (Domestic Volunteer Services; Nondiscrimination Provisions)
• 42 U.S.C. § 5151(a) (Nondiscrimination in Disaster Assistance)
• 42 U.S.C. § 5309(a) (Community Development; Nondiscrimination in Programs and Activities)
• 42 U.S.C. § 5891 (Development of Energy Sources; Sex Discrimination Prohibited)
• 42 U.S.C. § 6709 (Public Works Employment; Sex Discrimination; Prohibition; Enforcement)
• 42 U.S.C. § 6727(a)(1) (Public Works Employment; Nondiscrimination)
• 42 U.S.C. § 6870(a) (Weatherization Assistance for Low-Income Persons)
• 42 U.S.C. § 8625(a) (Low-Income Home Energy Assistance; Nondiscrimination Provisions)
• 42 U.S.C. § 9821 (Community Economic Development; Nondiscrimination Provisions)
• 42 U.S.C. § 9849 (Head Start Programs; Nondiscrimination Provisions)
• 42 U.S.C. § 9918(c)(1) (Community Services Block Grant Program; Limitations on Use of Funds)
• 42 U.S.C. § 10406(c)(2)(B)(i) (Family Violence Prevention and Services; Formula Grants to States)
• 42 U.S.C. § 11504(b) (Enterprise Zone Development; Waiver of Modification *1796 of Housing and Community Development Rules in Enterprise Zones)
• 42 U.S.C. § 12635(a)(1) (National and Community Service State Grant Program; Nondiscrimination)
• 42 U.S.C. § 12832 (Investment in Affordable Housing; Nondiscrimination)
• 43 U.S.C. § 1747(10) (Loans to States and Political Subdivisions; Discrimination Prohibited)
• 43 U.S.C. § 1863 (Outer Continental Shelf Resource Management; Unlawful Employment Practices; Regulations)
• 47 U.S.C. § 151 (Federal Communications Commission)
• 47 U.S.C. § 398(b)(1) (Public Broadcasting; Equal Opportunity Employment)
• 47 U.S.C. §§ 554(b) and (c) (Cable Communications; Equal Employment Opportunity)
• 47 U.S.C. § 555a(c) (Cable Communications; Limitation of Franchising Authority Liability)
• 48 U.S.C. § 1542(a) (Virgin Islands; Voting Franchise; Discrimination Prohibited)
• 48 U.S.C. § 1708 (Discrimination Prohibited in Rights of Access to, and Benefits From, Conveyed Lands)
• 49 U.S.C. § 306(b) (Duties of the Secretary of Transportation; Prohibited Discrimination)
• 49 U.S.C. § 5332(b) (Public Transportation; Nondiscrimination)
• 49 U.S.C. § 40127 (Air Commerce and Safety; Prohibitions on Discrimination)
• 49 U.S.C. § 47123(a) (Airport Improvement; Nondiscrimination)
• 50 U.S.C. § 3809(b)(3) (Selective Service System)
• 50 U.S.C. § 4842(a)(1)(B) (Anti-Boycott Act of 2018)
D

E.g. , H.R. 166, 94th Cong., 1st Sess., § 6 (1975); H.R. 451, 95th Cong., 1st Sess., § 6 (1977); S. 2081, 96th Cong., 1st Sess. (1979); S. 1708, 97th Cong., 1st Sess. (1981); S. 430, 98th Cong., 1st Sess. (1983); S. 1432, 99th Cong., 1st Sess., § 5 (1985); S. 464, 100th Cong., 1st Sess., § 5 (1987); H.R. 655, 101st Cong., 1st Sess., § 2 (1989); S. 574, 102d Cong., 1st Sess., § 5 (1991); H.R. 423, 103d Cong., 1st Sess., § 2 (1993); S. 932, 104th Cong., 1st Sess. (1995); H.R. 365, 105th Cong., 1st Sess., § 2 (1997); H.R. 311, 106th Cong., 1st Sess., § 2 (1999); H.R. 217, 107th Cong., 1st Sess., § 2 (2001); S. 16, 108th Cong., 1st Sess., §§ 701-704 (2003); H.R. 288, 109th Cong., 1st Sess., § 2 (2005).

See, e.g. , H.R. 2015, 110th Cong., 1st Sess. (2007); H.R. 3017, 111th Cong., 1st Sess. (2009); H.R. 1397, 112th Cong., 1st Sess. (2011); H.R. 1755, 113th Cong., 1st Sess. (2013); H.R. 3185, 114th Cong., 1st Sess., § 7 (2015); H.R. 2282, 115th Cong., 1st Sess., § 7 (2017); H.R. 5, 116th Cong., 1st Sess. (2019).

H.R. 5331, 116th Cong., 1st Sess., §§ 4(b), (c) (2019).

Section 7(b) of H.R. 5 strikes the term "sex" in 42 U.S.C. § 2000e-2 and inserts: "SEX (INCLUDING SEXUAL ORIENTATION AND GENDER IDENTITY)."

That is what Judge Posner did in the Seventh Circuit case holding that Title VII prohibits discrimination because of sexual orientation. See Hively v. Ivy Tech Community College of Ind. , 853 F.3d 339 (2017) (en banc). Judge Posner agreed with that result but wrote:
"I would prefer to see us acknowledge openly that today we, who are judges rather than members of Congress, are imposing on a half-century-old statute a meaning of 'sex discrimination' that the Congress that enacted it would not have accepted ." Id. , at 357 (concurring opinion) (emphasis added).

The Court does not define what it means by "transgender status," but the American Psychological Association describes "transgender" as "[a]n umbrella term encompassing those whose gender identities or gender roles differ from those typically associated with the sex they were assigned at birth." A Glossary: Defining Transgender Terms, 49 Monitor on Psychology 32 (Sept. 2018), https://www.apa.org/monitor/2018/09/ce-corner-glossary. It defines "gender identity" as "[a]n internal sense of being male, female or something else, which may or may not correspond to an individual's sex assigned at birth or sex characteristics." Ibid. Under these definitions, there is no apparent difference between discrimination because of transgender status and discrimination because of gender identity.

The EEOC first held that "discrimination against a transgender individual because that person is transgender" violates Title VII in 2012 in Macy v. Holder , 2012 WL 1435995, *11 (Apr. 20, 2012), though it earlier advanced that position in an amicus brief in Federal District Court in 2011, ibid ., n. 16. It did not hold that discrimination on the basis of sexual orientation violated Title VII until 2015. See Baldwin v. Foxx , 2015 WL 4397641 (July 15, 2015).

"Sexual orientation refers to a person's erotic response tendency or sexual attractions, be they directed toward individuals of the same sex (homosexual), the other sex (heterosexual), or both sexes (bisexual)." 1 B. Sadock, V. Sadock, & P. Ruiz, Comprehensive Textbook of Psychiatry 2061 (9th ed. 2009); see also American Heritage Dictionary 1607 (5th ed. 2011) (defining "sexual orientation" as "[t]he direction of a person's sexual interest, as toward people of the opposite sex, the same sex, or both sexes"); Webster's New College Dictionary 1036 (3d ed. 2008) (defining "sexual orientation" as "[t]he direction of one's sexual interest toward members of the same, opposite, or both sexes").

See n. 6, supra ; see also Sadock, supra, at 2063 ("transgender" refers to "any individual who identifies with and adopts the gender role of a member of the other biological sex").

See Tr. of Oral Arg. in Nos. 17-1618, 17-1623, pp. 69-70 ("If there was that case, it might be the rare case in which sexual orientation discrimination is not a subset of sex"); see also id. , at 69 ("Somebody who comes in and says I'm not going to tell you what my sex is, but, believe me, I was fired for my sexual orientation, that person will lose").

See also Brief for William N. Eskridge Jr. et al. as Amici Curiae 2 ("[T]here is no reasonable way to disentangle sex from same-sex attraction or transgender status").

Brief for Petitioner in No. 17-1618, at 14; see also Brief for Southern Poverty Law Center et al. as Amici Curiae 7-8.

Brief for Scholars Who Study the LGB Population as Amici Curiae in Nos. 17-1618, 17-1623, p. 10.

Brief for American Psychological Association et al. as Amici Curiae 11.

Reply Brief for Respondent Aimee Stephens in No. 18-107, p. 5.

Notably, Title VII itself already suggests a line, which the Court ignores. The statute specifies that the terms "because of sex" and "on the basis of sex" cover certain conditions that are biologically tied to sex, namely, "pregnancy, childbirth, [and] related medical conditions." 42 U.S.C. § 2000e(k). This definition should inform the meaning of "because of sex" in Title VII more generally. Unlike pregnancy, neither sexual orientation nor gender identity is biologically linked to women or men.

Two other Justices concurred in the judgment but did not comment on the issue of stereotypes. See id. , at 258-261, 109 S.Ct. 1775 (opinion of White, J.); id. , at 261-279, 109 S.Ct. 1775 (opinion of O'Connor, J.). And Justice Kennedy reiterated on behalf of the three Justices in dissent that "Title VII creates no independent cause of action for sex stereotyping," but he added that "[e]vidence of use by decisionmakers of sex stereotypes is, of course, quite relevant to the question of discriminatory intent." Id. , at 294, 109 S.Ct. 1775.

Notably, Title VII recognizes that in light of history distinctions on the basis of race are always disadvantageous, but it permits certain distinctions based on sex. Title 42 U.S.C. § 2000e-2(e)(1) allows for "instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise." Race is wholly absent from this list.

See American Heritage Dictionary 1188 (1969) (defining "sexual intercourse"); Webster's Third New International Dictionary 2082 (1966) (same); Random House Dictionary of the English Language 1308 (1966) (same).

See also Chisom v. Roemer , 501 U.S. 380, 405, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting) ("We are to read the words of [a statutory] text as any ordinary Member of Congress would have read them ... and apply the meaning so determined").

J. Kennedy, Statement by the President on the Establishment of the President's Commission on the Status of Women 3 (Dec. 14, 1961) (emphasis added), https://www.jfklibrary.org/asset-viewer/archives/JFKPOF/093/JFKPOF-093-004.

Analysis of the way Title VII's key language was used in books and articles during the relevant time period supports this conclusion. A study searched a vast database of documents from that time to determine how the phrase "discriminate against ... because of [some trait]" was used. Phillips, The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality (manuscript, at 3) (May 11, 2020) (brackets in original), https://ssrn.com/abstract=3585940. The study found that the phrase was used to denote discrimination against "someone ... motivated by prejudice, or biased ideas or attitudes ... directed at people with that trait in particular." Id. , at 7 (emphasis deleted). In other words, "discriminate against " was "associated with negative treatment directed at members of a discrete group." Id., at 5. Thus, as used in 1964, "discrimination because of sex" would have been understood to mean discrimination against a woman or a man based on "unfair beliefs or attitudes" about members of that particular sex. Id., at 7.

APA, Homosexuality and Sexual Orientation Disturbance : Proposed Change in DSM-II, 6th Printing, p. 44 (APA Doc. Ref. No. 730008, 1973) (reclassifying "homosexuality" as a "[s]exual orientation disturbance," a category "for individuals whose sexual interests are directed primarily toward people of the same sex and who are either disturbed by ... or wish to change their sexual orientation," and explaining that "homosexuality ... by itself does not constitute a psychiatric disorder"); see also APA, Diagnostic and Statistical Manual of Mental Disorders 281-282 (3d ed. 1980) (DSM-III) (similarly creating category of "Ego-dystonic Homosexuality" for "homosexuals for whom changing sexual orientation is a persistent concern," while observing that "homosexuality itself is not considered a mental disorder"); Obergefell v. Hodges , 576 U.S. 644, 661, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015).

In 1981, after achieving home rule, the District attempted to decriminalize sodomy, see D. C. Act No. 4-69, but the House of Representatives vetoed the bill, H. Res. 208, 97th Cong., 1st Sess. (1981); 127 Cong. Rec. 22764-22779 (1981). Sodomy was not decriminalized in the District until 1995. See Anti-Sexual Abuse Act of 1994, § 501(b), 41 D. C. Reg. 53 (1995), enacted as D. C. Law 10-257.

Rivera, Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States, 30 Hastings L. J. 799, 861 (1979).

Eskridge, Challenging the Apartheid of the Closet: Establishing Conditions for Lesbian and Gay Intimacy, Nomos , and Citizenship, 1961-1981, 25 Hofstra L. Rev. 817, 819 (1997).

Justices Douglas and Fortas thought that a homosexual is merely "one, who by some freak, is the product of an arrested development." Boutilier , 387 U.S. at 127, 87 S.Ct. 1563 (Douglas, J., dissenting); see also id. , at 125, 87 S.Ct. 1563 (Brennan, J., dissenting) (based on lower court dissent).

Drescher, Transsexualism, Gender Identity Disorder and the DSM, 14 J. Gay & Lesbian Mental Health 109, 110 (2010).

American Psychological Association, 49 Monitor on Psychology, at 32.

Green, Robert Stoller's Sex and Gender : 40 Years On, 39 Archives Sexual Behav. 1457 (2010); see Stoller, A Contribution to the Study of Gender Identity, 45 Int'l J. Psychoanalysis 220 (1964). The term appears to have been coined a year or two earlier. See Haig, The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles, 1945-2001, 33 Archives Sexual Behav. 87, 93 (2004) (suggesting the term was first introduced at 23rd International Psycho-Analytical Congress in Stockholm in 1963); J. Meyerowitz, How Sex Changed 213 (2002) (referring to founding of "Gender Identity Research Clinic" at UCLA in 1962). In his book, Sex and Gender, published in 1968, Robert Stoller referred to "gender identity " as "a working term" "associated with" his research team but noted that they were not "fixed on copyrighting the term or on defending the concept as one of the splendors of the scientific world." Sex and Gender, p. viii.

American Psychological Association, 49 Monitor on Psychology, at 32.

See Drescher, supra , at 112.

Buckley, A Changing of Sex by Surgery Begun at Johns Hopkins, N. Y. Times, Nov. 21, 1966, p. 1, col. 8; see also J. Meyerowitz, How Sex Changed 218-220 (2002).

Drescher, supra , at 112 (quoting Green, Attitudes Toward Transsexualism and Sex-Reassignment Procedures, in Transsexualism and Sex Reassignment 241-242 (R. Green & J. Money eds. 1969)).

See Osterman, Origins of a Myth: Why Courts, Scholars, and the Public Think Title VII's Ban on Sex Discrimination Was an Accident, 20 Yale J. L. & Feminism 409, 409-410 (2009).

Recent scholarship has linked the adoption of the Smith Amendment to the broader campaign for women's rights that was underway at the time. E.g. , Osterman, supra ; Freeman, How Sex Got Into Title VII: Persistent Opportunism as a Maker of Public Policy, 9 L. & Ineq. 163 (1991); Barzilay, Parenting Title VII: Rethinking the History of the Sex Discrimination Provision, 28 Yale J. L. & Feminism 55 (2016) ; Gold, A Tale of Two Amendments: The Reasons Congress Added Sex to Title VII and Their Implication for the Issue of Comparable Worth, 19 Duquesne L. Rev. 453 (1981). None of these studies has unearthed evidence that the amendment was understood to apply to discrimination because of sexual orientation or gender identity.

H.R. 1430, 102d Cong., 1st Sess., § 2(d) (as introduced in the House on Mar. 13, 1991); S. 574, 102d Cong., 1st Sess., § 5 (as introduced in the Senate on Mar. 6, 1991).

See Williamson v. A. G. Edwards & Sons, Inc. , 876 F.2d 69, 70 (CA8 1989) (per curiam ), cert. denied, 493 U.S. 1089, 110 S.Ct. 1158, 107 L.Ed.2d 1061 (1990) ; DeSantis v. Pacific Tel. & Tel. Co. , 608 F.2d 327, 329-330 (CA9 1979) ; Blum v. Gulf Oil Corp. , 597 F.2d 936, 938 (CA5 1979) (per curiam ).

Ruth v. Children's Med. Ctr. , 1991 WL 151158, *5 (CA6, Aug. 8, 1991) (per curiam ); Ulane v. Eastern Airlines, Inc. , 742 F.2d 1081, 1084-1085 (CA7 1984), cert. denied, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985).

See Ulane , 742 F.2d at 1084-1085 ; Sommers v. Budget Mktg., Inc. , 667 F.2d 748, 750 (CA8 1982) (per curiam ); Holloway v. Arthur Andersen & Co. , 566 F.2d 659, 661-663 (CA9 1977).

Dillon v. Frank , 1990 WL 1111074, *3-*4 (EEOC, Feb. 14, 1990) ; LaBate v. USPS , 1987 WL 774785, *2 (EEOC, Feb. 11, 1987).

In more recent legislation, when Congress has wanted to reach acts committed because of sexual orientation or gender identity, it has referred to those grounds by name. See, e.g. , 18 U.S.C. § 249(a)(2)(A) (hate crimes) (enacted 2009); 34 U.S.C. § 12291(b)(13)(A) (certain federally funded programs) (enacted 2013).

Contrary to the implication in the Court's opinion, I do not label these potential consequences "undesirable." Ante , at 1753. I mention them only as possible implications of the Court's reasoning.

Brief for Defend My Privacy et al. as Amici Curiae 7-10.

See 1 Sadock, Comprehensive Textbook of Psychiatry, at 2063 (explaining that "gender is now often regarded as more fluid " and "[t]hus, gender identity may be described as masculine, feminine, or somewhere in between").

Title IX makes it unlawful to discriminate on the basis of sex in education: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

See Dept. of Justice & Dept. of Education, Dear Colleague Letter on Transgender Students, May 13, 2016 (Dear Colleague Letter), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

A regulation allows single-sex teams, 34 CFR § 106.41(b) (2019), but the statute itself would of course take precedence.

"[S]ince 2017, two biological males [in Connecticut] have collectively won 15 women's state championship titles (previously held by ten different Connecticut girls) against biologically female track athletes." Brief for Independent Women's Forum et al. as Amici Curiae in No. 18-107, pp. 14-15.
At the college level, a transgendered woman (biological male) switched from competing on the men's Division II track team to the women's Division II track team at Franklin Pierce University in New Hampshire after taking a year of testosterone suppressants. While this student had placed "eighth out of nine male athletes in the 400 meter hurdles the year before, the student won the women's competition by over a second and a half--a time that had garnered tenth place in the men's conference meet just three years before." Id. , at 15.
A transgender male-i.e ., a biological female who was in the process of transitioning to male and actively taking testosterone injections--won the Texas girls' state championship in high school wrestling in 2017. Babb, Transgender Issue Hits Mat in Texas, Washington Post, Feb. 26, 2017, p. A1, col. 1.

Indeed, the 2016 advisory letter issued by the Department of Justice took the position that under Title IX schools "must allow transgender students to access housing consistent with their gender identity." Dear Colleague Letter 4.

Brief for National Association of Evangelicals et al. as Amici Curiae 3; see also Brief for United States Conference of Catholic Bishops et al. as Amici Curiae in No. 18-107, pp. 8-18.

Brief for National Association of Evangelicals et al. as Amici Curiae 7.

McConnell, Academic Freedom in Religious Colleges and Universities, 53 Law & Contemp. Prob. 303, 322 (1990).

See Our Lady of Guadalupe School v. Morrissey-Berru , No. 19-267; St. James School v. Biel , No. 19-348.

See, e.g. , EEOC v. Kamehameha Schools/Bishop Estate , 990 F.2d 458, 460 (CA9 1993) ; EEOC v. Fremont Christian School , 781 F.2d 1362, 1365-1367 (CA9 1986) ; Rayburn v. General Conference of Seventh-day Adventists , 772 F.2d 1164, 1166 (CA4 1985) ; EEOC v. Mississippi College , 626 F.2d 477, 484-486 (CA5 1980) ; see also Brief for United States Conference of Catholic Bishops et al. as Amici Curiae in No. 18-107, at 30, n. 28 (discussing disputed scope). In addition, 42 U.S.C. § 2000e-2(e)(1) provides that religion may be a BFOQ, and allows religious schools to hire religious employees, but as noted, the BFOQ exception has been read narrowly. See supra , at 1780.

See, e.g. , Amended Complaint in Toomey v. Arizona , No. 4:19-cv-00035, 2020 WL 1068269 (D Ariz., Mar. 2, 2020). At least one District Court has already held that a state health insurance policy that does not provide coverage for sex reassignment surgery violates Title VII. Fletcher v. Alaska , ---- F. Supp. 3d ----, ----, 2020 WL 2487060, *5 (D Alaska, Mar. 6, 2020).

See, e.g. , Complaint in Conforti v. St. Joseph's Healthcare System , No. 2:17-cv-00050, 2017 WL 67114 (D NJ, Jan. 5, 2017) (transgender man claims discrimination under the ACA because a Catholic hospital refused to allow a surgeon to perform a hysterectomy ). And multiple District Courts have already concluded that the ACA requires health insurance coverage for sex reassignment surgery and treatment. Kadel v. Folwell , ---- F. Supp. 3d ----, ----, 2020 WL 1169271, *12 (MDNC, Mar. 11, 2020) (allowing claims of discrimination under ACA, Title IX, and Equal Protection Clause); Tovar v. Essentia Health , 342 F.Supp.3d 947, 952-954 (D Minn. 2018) (allowing ACA claim).
Section 1557 of the ACA, 42 U.S.C. § 18116, provides:
"Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq. ), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq. ), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq. ), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection." (Footnote omitted.)

See, e.g. , University of Wisconsin Milwaukee Lesbian, Gay, Bisexual, Transgender, Queer Plus (LGBTQ+) Resource Center, Gender Pronouns (2020), https://uwm.edu/lgbtrc/support/gender-pronouns/ (listing six new categories of pronouns: (f)ae, (f)aer, (f)aers; e/ey, em, eir, eirs; per, pers; ve, ver, vis; xe, xem, xyr, xyrs; ze/zie, hir, hirs).

See 47 N.Y.C.R.R. § 2-06(a) (2020) (stating that a "deliberate refusal to use an individual's self-identified name, pronoun and gendered title" is a violation of N.Y.C. Admin. Code § 8-107 "where the refusal is motivated by the individual's gender"); see also N.Y.C. Admin. Code §§ 8-107(1), (4), (5) (2020) (making it unlawful to discriminate on the basis of "gender" in employment, housing, and public accommodations); cf. D.C. Mun. Regs., tit. 4, § 801.1 (2020) (making it "unlawful ... to discriminate ... on the basis of ... actual or perceived gender identity or expression" in "employment, housing, public accommodations, or educational institutions" and further proscribing "engaging in verbal ... harassment").

See University of Minn., Equity and Access: Gender Identity, Gender Expression, Names, and Pronouns, Administrative Policy (Dec. 11, 2019), https://policy.umn.edu/operations/genderequity ("University members and units are expected to use the names, gender identities, and pronouns specified to them by other University members, except as legally required"); Meriwether v. Trustees of Shawnee State Univ. , 2020 WL 704615, *1 (SD Ohio, Feb. 12, 2020) (rejecting First Amendment challenge to university's nondiscrimination policy brought by evangelical Christian professor who was subjected to disciplinary actions for failing to use student's preferred pronouns).

Cf. Notice of Removal in Vlaming v. West Point School Board , No. 3:19-cv-00773 (ED Va., Oct. 22, 2019) (contending that high school teacher's firing for failure to use student's preferred pronouns was based on nondiscrimination policy adopted pursuant to Title IX).